## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

ALLIED DYNAMICS CORP.,

      Plaintiff

      v.

KENNAMETAL, INC.
KENNAMETAL STELLITE f/k/a
MICROFUSIONE STELLITE S.p.A.

      Defendants.

**CV 12      5904**

Index No.: _____

**VERIFIED COMPLAINT**
JURY TRIAL DEMANDED

Plaintiff, Allied Dynamics Corp., by its attorneys Herzfeld & Rubin, P.C., alleges as follows:

## I.    PRELIMINARY STATEMENT

1.     Plaintiff Allied Dynamics Corp. ("ADC") brings this action against Kennametal, Inc. ("Kennametal") and Kennametal Stellite f/k/a Microfusione Stellite S.p.A. ("MFS") (collectively "Defendants") to recover damages arising from Defendants' breach of contract, fraudulent misrepresentations and unlawful withholding of Plaintiff's assets, and to retrieve wrongfully withheld assets.

2.     Plaintiff ADC is an engineer and manufacturer of turbine engine parts which are then sold to customers throughout the world.   Defendants manufacture components which were to be used by Plaintiff's customers in manufacturing their own parts.  Misled by Defendants' false assurances concerning their ability to manufacture blades conforming to specifications for certain turbine engines,

Plaintiff ordered the blades from Defendants. Plaintiff prepared and provided expensive *ad hoc* tools for Defendants to use in order to manufacture these products and Plaintiff incurred substantial expenses to do so.

3. Unbeknownst to Plaintiff, Defendants encountered serious problems during the manufacturing process. Rather than disclosing their inability to develop the products, Defendants continued to request additional ancillary tools from Plaintiff. Plaintiff's costs began to mount.

4. Being fully aware of their inability to manufacture the products, Defendants delayed the manufacturing while further misleading Plaintiff on their capability to produce additional products with –even more– complex specifications.

5. After the Plaintiff placed the order for the additional products and funded the creation of the tools to prepare them, Defendants delivered the products from the prior orders.

6. Defendants, being fully aware of the deficiencies in their processes and capabilities, issued false certification reports falsely attesting completion of x-ray tests, fluorescent penetrant inspections, and dimensional check reports on the products. Without those tests, key issues causing malfunctioning could not have been detected.

7. In reliance on Defendants' false reports and certifications, Plaintiff delivered defective products to Plaintiff's customers. Plaintiffs' customers, who conducted their own tests prior to using the products, detected the defects and returned the products to the Plaintiff.

8.       Defendant Kennametal became deeply involved with the matter and its representatives continued to mislead the Plaintiff about their ability to cure the defects.  In an effort to cure the defects and regain its relationship with its customers Plaintiff agreed to fund Defendants' efforts to cure the defects.

9.       Despite Defendants attempts to cure the defects, and notwithstanding the relevant costs incurred for that purpose, Plaintiff's customers terminated their relationship with Plaintiff.

10.      At this point, Defendants disclosed their inability to complete the following orders.  After candidly admitting to their misrepresentations, they simply cancelled the orders.

11.      Defendants are currently wrongfully withholding Plaintiff's tools.  Plaintiff demanded that the tools be returned, but to no avail.

12.      As a direct and proximate consequence of Defendants' false representations, contractual breach and unlawful withholding of Plaintiff's assets, Plaintiff suffered, and continues to suffer, substantial damages.

## II.    JURISDICTION AND APPLICABLE LAW

13.      This Court has jurisdiction over each of the named Defendants because they regularly transact business within the State of New York directly related to the unlawful conduct at issue in this case.  This dispute arises from a contract to be performed in the State of New York.  Defendants committed tortious acts causing injury to Plaintiff in the State of New York and Defendants regularly do and solicit business in the State of New York.

3

14.     This Court has subject matter jurisdiction over this action on the basis of diversity of citizenship of the parties and the amount in controversy pursuant to 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of diverse states.

15.     Venue is proper in this district because Defendants' breach of contract and wrongful acts arose in and emanated from this district and because the Plaintiff is based in this district.

16.     Plaintiff's contract claims are governed by the United Nations Convention on Contracts for the International Sale of Goods, April 11, 1980, S. Treaty Doc. No. 98-9 (1983), 1489 U.N.T.S. 3, 19 I.L.M. 668 (1980) ("CISG").  The CISG applies because Plaintiff's purchase orders are silent as to the choice of law and Plaintiff and MFS are in the United States and Italy, which are both signatory nations within the meaning of CISG, art.1.

## III.   PARTIES

17.     Plaintiff ADC engineers and manufactures turbine parts. The parts are then sold by Plaintiff to customers throughout the world.    ADC is headquartered at 84 Modular Avenue in Commack, New York.

18.     Upon information and belief, Defendant Kennametal manufactures components for aircrafts, ground vehicles, sea vessels, engines, and accessories.  Kennametal further provides services in underground mining, highway construction, oil and gas processing, general engineering and transportation.  Upon information and belief Kennametal is headquartered at 1600 Technology Way in Latrobe, Pennsylvania, has operations in over 60 countries and nearly 13,000 employees

4

worldwide. Kennametal is listed on the New York Stock Exchange and trades under the ticker symbol "KMT".

19.     Upon information and belief, Defendant MFS is a manufacturing services company specialized in precision investment castings for gas turbines. MFS markets itself as a company with long term experience in precision casting of super alloys and stainless steel and ability to provide nonconventional solutions to generate complex components. According to MFS's website, while its customers "concentrate on their product performance" MFS turns "their design into sophisticated cost effective processes and products." MFS is a wholly owned subsidiary of Kennametal. Upon information and belief, MFS is headquartered at via G. di Vittorio no. 24 at Pieve Emanuele, Milan, Italy.

## IV.     FACTUAL BACKGROUND

### A. The Contractual Terms

20.     ADC began its business relationship with MFS in 2007 by purchasing parts for gas turbine assembly. Since inception, ADC would issue purchase orders to MFS merely including the description of the goods to be provided, the amount, the delivery date and the price. The purchase orders were silent as to the parties' choice of law.

21.     In most instances MFS acknowledged the orders via telephone conversations or via email, without a formal confirmation order. In some cases, MFS would send the confirmation orders a few months later.

22.     As part of the agreement among the parties, ADC provided MFS with the tools to cast the engine parts in compliance with the requested specifications.  The costs to produce the tools were borne by ADC.

23.     Pursuant to the agreement between the parties, and as customary in the industry, MFS undertook to complete required inspections prior to the delivery of the products.  Inspections included x-rays, florescent penetrant inspection ("FPI") and dimensional check reports.  These inspections were necessary because certain defects, which cannot be detected with a visual inspection, may severely impact the engine's operating system.

### B. MFS's Initial Misrepresentations

24.     In the fall of 2007 during a video conference call MFS's sales director Gabriele Tuzi ("Tuzi") and MFS's technical director Carlo Mauri ("Mauri") represented to Mr. David Mott ("Mott"), ADC's sales manager, their ability to manufacture W251 Blade 1.  To induce Mott to place orders for this product, Tuzi and Mauri misrepresented their specific knowledge on the manufacturing of the product, their prior experience, and they showed on the video conference the product they alleged they had manufactured.

25.     Furthermore, Tuzi visited Mott at ADC's headquarters in New York and continued to misrepresent MFS's ability to manufacture the product.  In reliance on MFS's misrepresentations, Plaintiff placed orders for W251 Blade 1 ("Blade 1 type 251"), as specified below.  Upon information and belief, neither Tuzi nor Mauri had any prior experience on manufacturing this product.

26.     In June 2008 during a conference call Mott further inquired with Tuzi on MFS's capability to manufacture blades V94.2 ("Blade 1").

27.     Upon information and belief, Tuzi was fully aware that MFS had never manufactured Blade 1 or Blade 1 type 251 prior to Mott's request. Concealing MFS's and his own inexperience, Tuzi stated that MFS was fully equipped to manufacture those engine parts.

28.     In reliance on Tuzi's false assurances concerning MFS's ability to manufacture the products, ADC placed the purchase orders as specified below and began manufacturing the tools to cast the engine parts. Casting of the tools ordinarily requires- and in this case did require- more than six months for completion and entails substantial costs.

29.     Upon information and belief, Tuzi was fully aware that MFS lacked the required skills to complete the orders and produce the engine parts in compliance with ADC's requests.

## C. The Purchase Orders for Blade 1

30.     On September 23, 2008 ADC issued a purchase order for Blade 1 type 251 to MFS for the total amount of $194,665.92 (the "First Purchase Order"). One hundred and seventy (170) parts were to be delivered by October 1, 2009, and eighty-eight (88) parts were to be delivered by December 1, 2009. As set forth in the First Purchase Order, and as is customary in the industry, ADC provided MFS with the wax tools to complete the order. The tools were manufactured at ADC's expense.

31.     The First Purchase Order further set forth MFS's obligation to deliver certificates of completed chemical and mechanical analysis jointly with the

7

products.  As provided by the First Purchase Order, MFS agreed to x-ray each part, complete a FPI inspection, and conduct a dimensional check report.  In the absence of these procedures, the parties could not verify that the engine parts complied with the industry standard or whether they concealed defects.

32.     On August 12, 2008, Plaintiff placed an additional order for Blade 1 type 251 for the price of $39,615.00. (The "Second Purchase Order").

33.     Pursuant to the Second Purchase Order, MFS was mandated to x-ray each part, complete a FPI inspection and conduct a dimensional check report.  Plaintiff would bear the costs to manufacture the tools to cast the products.

34.     Encountering various manufacturing issues during the production of Blade 1 type 251, the Defendants requested Plaintiff to provide additional ancillary tools which were broken by Defendants' negligent manufacturing process.  To replace these ancillary parts, Plaintiff paid $100,388.00.

35.     Plaintiff's most important customer, Aviation Technology & Turbine Services Inc. ("ATTS"), had ordered Blade 1 type 251 from Plaintiff.

36.     After delaying delivery of Blade 1 type 251 for more than two years, MFS delivered merely 56 parts from the First Purchase Order in May 2011.  Several parts had material defects.  The remaining parts from Plaintiff's order were never delivered.  ATTS cancelled the order it had placed for the remaining parts.

37.     Had MFS disclosed its inability to execute the orders, ADC would have not ordered Blade 1 type 251 or replaced the ancillary tools to manufacture it or solicited orders from customers concerning this product.

8

38.      On April 28, 2009, ADC issued a purchase order for a V94.2 Blade 1 ("Blade 1") to MFS for the total amount of $146,115.00 (the "Third Purchase Order").

39.      The Third Purchase orders also set forth MFS's obligation to deliver certificates of completed chemical and mechanical analysis jointly with the products. ADC borne the costs for the tools.

40.      On August 8, 2009, ADC placed an additional order for a Blade 1 engine part to MFS (the "Fourth Purchase Order") for the price of $133,366.00.

41.      The Blade 1 parts ordered by ADC required the production of a set of tools and were designed for ADC's customer Energy Deployment Co. Limited ("Energy Deployment").

42.      The cost to manufacture the tools was approximately $300,000. The production mandated casting, machining and coating of the tools, which required months to be completed and $175,000 of expenses.

43.      Had MFS disclosed its inability to execute the orders, ADC would have not ordered these tools, which were produced for the sole purpose of manufacturing Blade 1.

44.      During the manufacturing, MFS further requested replacement of several ancillary pieces of equipment, which were destroyed during its faulty process. ADC timely replaced those pieces incurring additional expenses.

### D. MFS's Additional Misrepresentations

45.      Upon information and belief, MFS detected several serious issues during the production of Blade 1, but continued to portray itself as an expert in the

manufacturing of the blades.  MFS continued to delay the production but maintained that it was fully capable to complete the purchase orders.

46.       MFS replaced its technical director Mauri with a new director, Mr. Hurlich Huber ("Huber")

47.       On various occasions throughout 2010 Huber and Terry Williams ("Williams"), one of MFS's lead engineers, during conference calls with Mott attempted  to persuade Mott about MFS's increased capability to produce highly complex blades.

48.       In December 2010, in a further attempt to deceive Mott, Huber and Williams held a conference call where they described specific blades that, they asserted, could be successfully created by their company.   Williams further misrepresented that those blades were produced by the company who previously employed him, that he had worked on the production and had notable experience on the creation of this specific product.  Huber further confirmed his own personal knowledge of manufacturing "tricks" in relation to these blades and his own experience in the production.  Upon information and belief and as later revealed to Mott by Mr. Mauro Bianchi ("Bianchi"), a MFS employee, Huber had in fact never seen those blades, let alone manufactured them before as explained more fully below.   Likewise, upon information and belief, Williams had no prior experience on manufacturing these blades.

## E. The Purchase Orders for Blades 4 and 5

49.       In reliance on Huber's and Williams' false representations, on January 26, 2011, ADC placed a purchase order for 13E2 Blade 4 ("Blade 4") and

10

13E2M05 Blade 5 ("Blade 5") engine parts for the total amount of $1,098,895.00 (the "Fifth Purchase Order")

50.     To complete the manufacturing of Blades 4 and 5, Plaintiff prepared *ad hoc* tools. Plaintiff's production costs amount to approximately $500,000.

51.     Plaintiff further paid for the tests to be completed on Blades 4 and 5 the total amount of Euro 46,000.00.

52.     Had MFS disclosed its inability to complete the production, ADC would have not ordered these tools, which were produced for the sole purpose of manufacturing Blades 4 and 5.

53.     ADC received orders for Blade 4 and 5 and executed contracts for their sale with its customer Turbo Dynamics for the price of $1,062,500.00 and $1,197,000.00 respectively.

54.     On August 31, 2011 MFS announced that Keir Lane ("Lane") had been appointed as MFS' new technical director replacing Huber.

## F. Kennametal's Participation in the Scheme

55.     On January 18, 2012, MFS informed its customers, including Plaintiff, that Kennametal was finalizing its acquisition of MFS. In its letter addressed to its customers, MFS explained its relationship with Kennametal and stated the companies' new affiliation:

> "[w]e share the view that together we can offer a broad range of services and technologies to both of our customer groups and together we can support our customers' development and business better and better."

56.     Upon information and belief, on March 1, 2012 Kennametal acquired MFS through the acquisition of Deloro Stellite Holdings 1 ("DSH1"). DSH1 wholly owned MFS. In turn, Kennametal acquired MFS.

11

57.     Shortly after the acquisition, Mott began contacts with Kennametal, who controlled and monitored MFS's relationship with its customers.

58.     Mott contacted William Thalman ("Thalman"), director of Mergers and Acquisitions and Planning at Kennametal and reported to him MFS's delays in responding to his queries concerning the pending orders and manufacturing of Blade 1.

59.     Thalman began participating in conference calls with Mott and became heavily involved in the day-to-day management of the manufacturing of the products and the relationship with ADC.

60.     Thalman's involvement brought the appearance of additional expertise to MFS's operations.  When issues concerning ADC's orders of Blades 1, 4 and 5 began to emerge, Thalman attempted resolution of the issues by facilitating communications so that products in compliance with the orders could be delivered.

## G. Defendants' Failure to Fulfill their Contractual Obligations

61.     During the process of production of Blade 1, MFS required ADC to provide additional tooling as its poor performance caused the breakage of several accessories.  ADC replaced the broken parts bearing additional costs in the amount of $20,000.

62.     In May 2011 and on July 29, 2011 MFS delivered the Blades 1 to ADC accompanied by inspection reports.  The reports falsely indicated that the parts complied with the specifications included in the purchase orders and were not defective.

63.      In reliance on MFS's false representations, ADC in turn delivered Blades 1 to its customer Energy Deployment.

64.      Prior to employing the Blade 1, Energy Deployment repeated the tests that had purportedly been completed by the Defendants. These tests revealed a myriad of concealed defects, which should have – and certainly could have– been detected by MFS, had MFS truly performed the tests it certified were conducted.

65.      Further to the discovery of the defects, Energy Deployment returned the defective products to ADC. In an effort to maintain the relationship with one of its most important clients, ADC paid additionally $75,000 to a third party to repair those parts. After receiving a substantial discount on the purchase price, Energy Deployment accepted the products but voiced concerns about the overall performance. As a direct result of the defective products supplied by Defendants, Energy Deployment is no longer ADC's customer.

66.      Meanwhile Plaintiff's client PAS Technologies Ireland Ltd. ("PAS") contacted the Plaintiff to place an order for Blade 1. After receiving assurances from the Defendants that all issues had been satisfactorily resolved, Plaintiff accepted the orders. Blade 1 was delivered to PAS. PAS tested the products and found substantial defects. In an attempt to maintain its relationship with PAS, and in light of the substantial costs already sustained for the production of Blade 1, Plaintiff requested the Defendants to cure the defects. Defendants attempted to rectify the defects and the products were delivered to PAS.

67.      Unlike Energy Deployment, PAS never accepted the defective products. On March 2, 2012 in an email communication to Mott, Mr. Declan

13

O'Leary informed Mott of the results of testing he had conducted on the blades and stated:

> "The vast majority of these parts have been shown to be defective following these inspections. Ken has already highlighted the defects that were found on the first five parts that were sent to PAS Technologies. The second batch unfortunately was in a similar condition and as such is not suitable to progress through coating. I cannot progress these parts due to the results of the inspections. **Unfortunately, we must return these parts to you and cancel the order as the parts are non-conforming and as such we expect our deposit to be returned in full. It's disappointing that these parts did not work out. It leaves us in a bad position with our customer, but we cannot take a risk with the reputation of Allied Dynamics or PAS Technologies by sending non-conforming product to our customer.** I hope we can still continue to do business in the future.

68.     As a direct result of the defective products supplied by Defendants, PAS is also no longer ADC's customer.

## H. Defendants' Acknowledgment of the Breach

69.     After receiving defective Blade 1 type 251, on May 24, 2011 and in light of MFS' failure to complete the order, Mott, in an email communication to Bianchi, requested the tools to be returned. Bianchi responded that the tools would be returned and added: "we failed, but we should have never taken this [sic] blades on board from start."

70.     Furthermore, on March 29, 2012 Lane, MFS's technical director at the time, wrote to Mott in an e-mail communication that MFS conducted the inspection of the mold used for the manufacturing of Blade 4 and that he had "bad news." Of the six mold inspected, two molds had each one core broken and four had "broken cores on both parts." Lane communicated that MFS had opened two molds in the attempt to establish the roots of the defect and that "the break is not in the same region as last time." Lane further explained the technical reason for the break as follows:

14

"The break this time appears to have moved 2" up the blade and are now breaking at the end of the Webb radii. The tip float is well intact and seems to have allowed the deferential contraction between the core and shell material. What we have witnessed is that the core pins are bent inside the mould [sic] and this indicates that this would have happened during our de-wax process, we have reached this conclusion because these molds are fixture at 45deg angle to fit inside the chamber, whilst doing this the cores have a high stress acting up on theme as the melting was expands forcing the core to move in a CC to CV direction inside the mould [sic]. The platinum pins we have added are 1mm zirconia stabilized platinum which offers high properties at temperature but even these cannot with stand [sic] the stressed being applied during the de-wax process. The typical way of de-waxing this part is to have the mold's stood [sic] vertically allowing the wax to act evenly on the core whilst melting and evacuating the mould [sic.] **With current KMS equipment this is not possible due to the size of component and therefore conclude [sic] to not have any options to resolve this matter.** [Emphasis added].

71.     On March 29, 2012, Bianchi, in complete disregard of MFS's obligations, in an email communication simply wrote "[s]orry David, we genuinely tried and have no doubt Keir and Scott did their best, nevertheless looks like this is just difficult for us at least right now."

72.     In view of Defendants' misrepresentations and breaches of contract and in an effort to complete the manufacturing of Blades 4 and 5, ADC engaged a new manufacturer, Turbine Castings.  ADC requested MFS to provide complete instructions about the wax preparations and additional knowledge gained during the unsuccessful and costly trial.

73.     Further, on March 30, 2012, Bianchi candidly acknowledged MFS's misrepresentations and breaches of contract in an e-mail communication. Bianchi wrote to Mott that when MFS accepted ADC's purchase orders MFS had "a technical director that did not recognize the real situation of the parts." Bianchi further stated:

"as you know he is no more working for us, this should mean something already, nevertheless we did several things in order to fix the situation with our equipment

15

in order to fulfill this gap.  I can make a long list of things we have done but at the end the result is that in our biz ["business'] sometimes these things can happen, we are not machining parts but transforming metal fomr ingots [sic] in very complex shaped and cored IGT components, be assured we will not do the same mistake in the future."

74.     Bianchi's reference to MFS's technical director was to Huber who, in the meantime, had been fired due to his apparent incompetence.

75.     Blades 4 and 5 were never completed and never delivered to ADC who, in turn, could not sell the products to its customer Turbo Dynamics.

76.     In July 2012, during a conference call between Mott, Thelman and Bianchi, Mott voiced his concerns and listed the issues regarding the orders placed by ADC.  Bianchi acknowledged Defendants' numerous failures.

77.     A former MFS's employee later revealed to Mott that MFS's marketing plan was aggressive and included misrepresentations to clients concerning the company's capability to manufacture products with complex specifications.

## I. ADC's Profits Loss

78.     On July 29, 2008, ATTS placed an order for Blade 1 type 251 for the price of $265,000.00 (two hundred sixty five thousand dollars).  Because of Defendants' inability to fulfill the order and complete the manufacturing, ATTS cancelled the order.

79.     Furthermore, Blade 1 type 251 is in high demand in the Middle East.  Defendants' inability to manufacture Blade 1 type 251 caused ATTS to cease participating in the bidding process to provide this product and, in turn, increased Plaintiff's loss.

16

80.     On April 26, 2009 Energy Deployment placed an order for Blade 1 for the price of $417,000. Because of Defendants' faulty manufacturing, only approximately $200,000 was paid to Plaintiff.

81.     On August 9, 2009, Energy Deployment had placed an order for Blade 1 for the price of $400,500.00.

82.     Following the Defendants' failures, Energy Deployment cancelled the order on May 12, 2010. Energy Deployment did not place any additional orders.

83.     Prior to the issues caused by the Defendants, Energy Deployment had placed orders in the amount of approximately $1,500,000.00, which had created a steady flow of income for ADC.

84.     On March 30, 2011, PAS had placed an order for Blade 1 for the price of $340,000. This amount was never paid to ADC because PAS did not accept delivery of the defective products manufactured by the Defendants.

85.     Furthermore, as a direct consequence of Defendants' inability to manufacture the products, ADC's orders from customers have greatly declined.

## J. Defendants' Unlawful Withholding of ADC's Tools

86.     To further harm the Plaintiff, Defendants are currently unlawfully withholding ADC's tools. These tools indisputably belong to Plaintiff. Plaintiff's cost to manufacture these tools exceeded $300,000, and these tools have a much greater market value. Despite ADC's numerous demands that Defendants return the tools to Plaintiff, Defendants refuse to return Plaintiff's tools for no legitimate reason.

87.     Without these tools, Plaintiff cannot manufacture certain engine parts making ADC's incapable to meet Plaintiff's customers' requests further irreparably harming Plaintiff's business.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**
**Pursuant to the CISG**
**Against Defendants**

88.     Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1-87 set forth above.

89.     On April 28, 2009, August 12, 2009, and January 26, 2011 Plaintiff placed orders for certain engine parts to MFS.  MFS verbally accepted those orders on the same date of each order and entered into binding agreements.

90.     In 2011 MFS materially breached its obligations under the contracts by: (i) delivering defective products accompanied by false reports certifying successful testing of the products, and (ii) failing to deliver certain products ordered by the Plaintiff.

91.     Kennametal was aware of MFS' conduct and assisted MFS in the breach.

92.     Plaintiff has fully performed its obligations under the agreements.

93.     As a direct, proximate, and foreseeable result of the Defendants material breach, Plaintiff has suffered and continues to suffer immediate as substantial damages.

## SECOND CAUSE OF ACTION
## FRAUD
### Against the Defendants

94.        Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1-87 set forth above.

95.        Plaintiff is informed and believes that the Defendants entered into a plan, arrangement and conspiracy to do, and pursuant to said agreement and conspiracy did in fact do, induce the Plaintiff to enter into an agreement to manufacture certain engine parts. Being fully aware of the issues they had encountered during the production of these parts and aware of their inability to manufacture the products, Defendants made representations they knew to be false to induce the Plaintiff to enter into additional agreements for the production of additional specified parts.

96.        Had Plaintiff known that the Defendants were misrepresenting their skills, competence and ability to manufacture the products ordered, Plaintiff would have not entered into the agreements. At the time Defendants' misrepresentations were made, Plaintiff had no knowledge of the falsity of the representations, nor reason to know of the falsity of the information and, in fact, believed Defendants representations to be true. Plaintiff reasonably relied on Defendants' misrepresentations.

97.        Defendants further issued fraudulent reports accompanying the products delivered to the Plaintiff in order to induce the Plaintiff to accept defective parts. The reports falsely attested that tests had been conducted. In reliance on these fraudulent reports, Plaintiff delivered defective products to its customers.

98.          As a direct, proximate, and foreseeable result of the Defendants' misrepresentations, Plaintiff has suffered and continues to suffer immediate as substantial damages.

### THIRD CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### Against the Defendants

99.          Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1-87 set forth above.

100.          Defendants misrepresented to the Plaintiff their ability to manufacture certain engine parts.  By virtue of their relationship with the Plaintiff, the Defendants had a duty to provide accurate information regarding Defendants' experience and ability to manufacture parts conforming to certain specifications.   When the Defendants misrepresented their ability to manufacture the blades, they knew or with reasonable diligence, should have known that Defendants had no such ability or experience in manufacturing those products.

101.          Defendants knew that the Plaintiff intended to sell these engine parts to Plaintiff's customers.   In reliance on Defendants' negligent misrepresentations concerning their ability to manufacture the products, the Plaintiff ordered those products from the Defendants and, in turn, sold them to its customers.

102.          Plaintiff       reasonably       relied       on       Defendants' misrepresentations.

103.          As a direct, proximate, and foreseeable result of the Defendants' misrepresentations, Plaintiff has suffered and continues to suffer immediate as substantial damages.

20

## FOURTH CAUSE OF ACTION
## REPLEVIN
### Against the Defendants

104.    Plaintiff incorporates by reference each and every allegation set forth in paragraphs 1-87 set forth above.

105.    Plaintiff is the sole, lawful owner of the tools to cast engine parts, as described herein, and is entitled to possession thereof.

106.    Defendants are wrongfully withholding Plaintiff's tools.

107.    Plaintiff demanded the return of the tools from the Defendants, but Defendants continue to maintain unlawful possession without any legitimate excuse.

## JURY DEMAND

108.    Plaintiff hereby demands a trial by jury on all the issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

1.    That compensatory damages, including loss of profits, caused by Defendants' acts and omissions in the amount of $10 million, plus interest thereon at the rate of 8% per annum be granted to Plaintiff.

2.    That punitive damages in the amount of $200 million be granted to Plaintiff for Defendants' fraudulent conduct.

3.    That Plaintiff's tools be ordered returned to Plaintiff.

4.    Such other relief as Plaintiff may be entitled.

Dated: New York, New York
      November 27, 2012

                HERZFELD & RUBIN, P.C.

By: _____

Gisella Caroti
Mark A. Weissman
Lydia Ferrarese
125 Broad Street
New York, New York 10004
(212) 471-8500

STATE OF NEW YORK   )
                    )        ss.
COUNTY OF NEW YORK  )


## VERIFICATION

DAVID MOTT, being duly sworn, states:

    1. I am the sales manager of ADC, the Plaintiff in this action;

    2. I have read the foregoing complaint dated November 27, 2012 and know

the contents thereof to be true to my own knowledge.

David Mott

Sworn before me this 27 day of November 2012

Notary Public

JOHN F. LINDHOLM
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01LI6194223
Qualified in Suffolk County
Commission Expires 09/29/2016

23