# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 12-cv-5904 (JFB) (AKT)

———————————

ALLIED DYNAMICS CORP.,

Plaintiff,

VERSUS

KENNAMETAL, INC. AND KENNAMETAL STELLITE, FORMERLY KNOWN AS MICROFUSIONE STELLITE S.P.A.

Defendants.

———————————

**MEMORANDUM AND ORDER**
September 4, 2013

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Allied Dynamics Corporation ("plaintiff" or "Allied") brings this action against Kennametal, Inc. ("Kennametal") and Kennametal Stellite, formerly known as Microfusione Stellite S.p.A., ("MFS") (collectively, "defendants"), alleging causes of action for breach of contract, negligent misrepresentation, fraud, and replevin.

This case relates to the business relationship that began between plaintiff, a corporation headquartered in New York, and MFS, a company doing business in Italy, back in 2007. Plaintiff, an engineer and manufacturer of turbine parts, sought to purchase blade parts from MFS for gas turbine assembly. In alleged reliance on MFS's representations about its experience producing the blades plaintiff desired and its ability to manufacture blades in the amount and quality that plaintiff required, plaintiff issued various purchase orders to MFS. According to plaintiff, MFS failed to provide goods of the quantity and quality promised. Thereafter, plaintiff initiated this lawsuit, alleging that MFS and its parent company, Kennametal, breached their contracts for the provision of blades to plaintiff, negligently and fraudulently misrepresented both their ability to perform under the contracts and the quality of the goods that they sent to plaintiff pursuant to the contracts, and have retained unlawful possession of tools that plaintiff sent them to aid in their manufacture of the blades.

Presently before this Court is defendants' motion to dismiss. Defendants move to dismiss the complaint on three grounds. First, defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(2), to dismiss the complaint as to MFS for lack of

personal jurisdiction. Second, defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(3), to dismiss the action for improper venue (or, in the alternative, under the doctrine of *forum non conveniens*). Finally, defendants move to dismiss various claims contained within the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a plausible cause of action upon which relief may be granted.

For the reasons discussed in detail below, the Court denies defendants' Rule 12(b)(2) motion to dismiss as to MFS for lack of personal jurisdiction. As explained *infra*, the Court concludes that, because plaintiff has adequately alleged a *prima facie* case of personal jurisdiction over MFS, its exercise of jurisdiction over MFS is appropriate. Specifically, based on the facts alleged and the affidavits submitted on the issue of personal jurisdiction, the Court finds that its exercise of jurisdiction over MFS on all causes of action is proper under N.Y. C.P.L.R. § 302(a)(1) and the Due Process Clause of the Fourteenth Amendment.

However, the Court concludes that, given the disputed issues of fact that exist with regard to the forum selection clause issue discussed in detail below, an evidentiary hearing in connection with the Rule 12(b)(3) motion is necessary. Thus, the Court defers deciding defendants' Rule 12(b)(3) and Rule 12(b)(6) motions until an evidentiary hearing has been conducted.

## I. BACKGROUND

### A. The Complaint

The following facts are taken from the complaint, including documents attached to or incorporated by reference in the complaint. These facts are not findings of fact by the Court. Instead, the Court assumes these facts to be true for purposes of deciding the pending motion, and will construe them in a light most favorable to plaintiff, the non-moving party.

### 1. General Business Relationship Between Plaintiff and MFS

Plaintiff, an engineer and manufacturer of turbine parts, began its business relationship with MFS, a manufacturing company headquartered in Italy that specializes in prevision investment castings for gas turbines, in 2007. (Compl. ¶¶ 17, 19, 20.) Plaintiff sought to purchase parts from MFS for gas turbine assembly. (*Id.* ¶ 20.) In order to do so, plaintiff issued purchase orders to MFS that included the description of the goods to be provided, the amount, the delivery date, and the price. (*Id.*) MFS would generally acknowledge the purchase orders it received from plaintiff via a telephone call or e-mail. On certain occasions, MFS would also send plaintiff a formal written confirmation order. (*Id.* ¶ 21.)

"As part of the agreement among the parties, [plaintiff] provided MFS with the tools to case the engine parts in compliance with the requested specifications." (*Id.* ¶ 22.) Plaintiff bore the costs of producing those tools. (*Id.*) Also "[p]ursuant to the agreement between the parties, and as customary in the industry, MFS undertook to complete required inspections prior to the delivery of the products," which included x-rays, fluorescent penetrant inspection ("FPI"), and dimensional check reports. (*Id.* ¶ 23.)

### 2. Purchase Orders for W251 Blade 1

In the fall of 2007, plaintiff participated in a videoconference with MFS. During that conference, Gabriele Tuzi ("Tuzi"), MFS's sales director, and Carlo Mauri ("Mauri"), MFS's technical director, represented to

David Mott ("Mott"), plaintiff's sales manager, MFS's ability to manufacture W251 Blade 1 ("Blade 1"). (*Id.* ¶ 24.) During the videoconference, Tuzi and Mauri showed Mott a Blade 1 that they claimed to have manufactured. (*Id.*)[1] Tuzi also visited Mott at plaintiff's headquarters in New York to discuss MFS's ability to manufacture Blade 1. (*Id.* ¶ 25.) Moreover, during a conference call in June 2008, Mott again questioned Tuzi about MFS's ability to manufacture such blades, to which Tuzi replied that MFS was fully equipped to manufacture the engine parts. (*Id.* ¶ 26-27.)

In reliance on Tuzi's and Mauri's assurances, plaintiff proceeded to place orders for the product. (*Id.* ¶ 28 (indicating that plaintiff placed orders and began manufacturing the tools to case the engine parts "[i]n reliance" on the "false assurances concerning MFS's ability to manufacture the products").) On September 23, 2008, plaintiff issued a purchase order for Blade 1 to MFS for $194,665.92 (the "First Purchase Order"). (*Id.* ¶ 30.) Pursuant to the First Purchase Order, 170 parts were to be delivered by October 1, 2009 and 88 parts were to be delivered by December 1, 2009. (*Id.*) Plaintiff provided MFS with wax tools to complete the First Purchase Order – tools that plaintiff manufactured at its own expense. (*Id.*) The First Purchase Order also set forth MFS's "obligation to deliver certificates of completed chemical and mechanical analysis jointly with the products." (*Id.* ¶ 31.)

Plaintiff placed another order for Blade 1 with MFS, in the amount of $39,615.00 (the "Second Purchase Order"). (*Id.* ¶ 32.)[2] The Second Purchase Order contained the same requirement that MFS x-ray each part, complete an FPI inspection, and conduct a dimensional check report before sending the products produced to plaintiff. (*Id.* ¶ 33.) Following the placement of the Second Purchase Order, MFS requested that plaintiff provide additional wax tools, as MFS had broken some of the tools originally provided by plaintiff. (*Id.* ¶ 34.) Plaintiff spent $100,388.00 on those additional tools. (*Id.*)[3]

On April 28, 2009, plaintiff issued a third purchase order for Blade 1, in the amount of $146,115.00 (the "Third Purchase Order"). (*Id.* ¶ 38.) Like the purchase orders that came before it, the Third Purchase Order set forth MFS's obligation to conduct the requisite testing and inspection of the products before sending them to plaintiff. (*Id.* ¶ 39.)

On August 8, 2009, plaintiff placed a fourth order for Blade 1, in the amount of $133,366.00 (the "Fourth Purchase Order"). (*Id.* ¶ 40.)[4] The cost to plaintiff of

---

[1] Plaintiff also alleges that Tuzi and Mauri represented to have prior experience manufacturing the product (Compl. ¶¶ 24-25), but that "[u]pon information and belief, neither Tuzi nor Mauri had any [such] prior experience (*id.* ¶ 25; *see also id.* ¶ 27 ("Tuzi was fully aware that MFS had never manufactured [the blades]," but "[c]oncealed[ed] MFS's and his own inexperience, [and] stated that MFS was fully equipped to manufacture those engine parts."); *id.* ¶ 29 ("Upon information and belief, Tuzi was fully aware that MFS lacked the required skills to complete the orders and produce the engine parts in compliance with [plaintiff's] requests.")).

[2] In the complaint, plaintiff alleges that this Second Purchase Order was placed on August 12, 2008. However, it seems as though plaintiff made a typographical error, as the date provided for the Second Purchase Order comes before the date provided for the First Purchase Order.

[3] Plaintiff alleges that MFS had detected "several serious issues" during the production of these blades, "but continued to portray itself as an expert in the manufacturing of the blades," thereby leading plaintiff to place additional orders. (*Id.* ¶ 45.)

[4] Although the complaint alleges that the Fourth Purchase Order was placed on August 8, 2009, both an exhibit attached to the declaration submitted by plaintiff in opposition to the motion and the declaration submitted by defendants in support of their motion indicate that the Fourth Purchase Order

manufacturing the tools MFS needed to fulfill the Fourth Purchase Order was $300,000 plus an additional $175,000 to cast, machine, and coat the tools once manufactured. (*Id.* ¶ 42.) During the manufacture of these later purchase orders, MFS requested additional tool replacements, which plaintiff provided at its own expense. (*Id.* ¶ 44.) The costs plaintiff incurred for all of the additional tools MFS requested during its production of Blade 1 amounted to $20,000. (*Id.* ¶ 61.)

### 3. Purchase Orders for Additional Blades

At some point in time, MFS replaced Mauri with a new technical director, Hurlich Huber ("Huber"). (*Id.* ¶ 46.) On "various occasions throughout 2010," Huber and Terry Williams ("Williams"), one of MFS's lead engineers, represented to Mott MFS's capability to produce other highly complex blades. (*Id.* ¶ 47.) During a conference call in December 2010, Huber and Williams "described specific blades that, they asserted, could be successfully created by their company." (*Id.* ¶ 48.)[5]

In reliance on those representations, on January 26, 2011, plaintiff placed a purchase order for 13E2 Blade 4 ("Blade 4") and 13E2M05 Blade 5 ("Blade 5") engine parts, in the amount of $1,098,895.00 (the "Fifth Purchase Order"). (*Id.* ¶ 49.) Plaintiff's cost of producing the tools MFS needed to fulfill the Fifth Purchase Order amounted to

$500,000. (*Id.* ¶ 50.) Plaintiff also paid for the tests that would be conducted on the products to ensure their proper functioning, which cost €46,000. (*Id.* ¶ 51.) After issuing the Fifth Purchase Order, plaintiff received orders for the blades and executed contracts for their sale with its customer Turbo Dynamics, for the price of $1,062,500 (for Blade 4) and $1,197,000 (for Blade 5). (*Id.* ¶ 53.)

### 4. MFS's Failure to Adequately Fulfill the Purchase Orders

Defendants delayed delivery of Blade 1 for quite some time. Despite its delay, MFS "maintained that it was fully capable to complete the purchase orders." (*Id.* ¶ 45.) In May 2011, MFS finally delivered 56 parts from the First Purchase Order. (*Id.* ¶ 36.) Several of those parts had "material defects," and the remaining parts that had not been sent were never delivered. (*Id.*) As a result, a customer of plaintiff's who had ordered the product, Aviation Technology & Turbine Services Inc. ("ATTS"), cancelled the order it had placed (in the amount of $265,000) for the remaining parts. (*Id.*; *see also id.* ¶ 78.) Following the defective shipment and MFS's failure to complete the First Purchase Order, Mott sent an email to Bianchi, an MFS employee, requesting that MFS return the tools plaintiff had provided for production of Blade 1. (*Id.* ¶ 69.) Bianchi responded that the tools would be returned, and added the following: "'we failed, but we should have never taken this [sic] blades on board from start.'" (*Id.*)

On July 29, 2011, MFS delivered additional Blade 1 to plaintiff. (*Id.* ¶ 62.) The delivery was accompanied by the requisite inspection reports, which indicated that the parts complied with the specifications contained within the purchase orders, and that none of the parts were defective. (*Id.* ¶ 62.) Plaintiff then delivered

---

[5] was placed on August 12, 2009. (*See* David Mott Decl. in Opp'n to Mot. to Dismiss ("Mott Decl.") Ex. B, at 13; Mauro Bianchi Decl. in Supp. of Mot. to Dismiss ("Bianchi Decl.") ¶ 17.)

[5] Plaintiff alleges that, despite the fact that both Huber and Williams represented that they had prior experience producing the blades they discussed during the December 2010 conference call, "[u]pon information and belief . . . Huber had in fact never seen those blades, let alone manufactured them[,] before . . . [and] Williams had no prior experience [] manufacturing these blades." (*Id.* ¶ 48.)

Blade 1 to Energy Deployment, one of its customers (pursuant to Energy Deployment's April 26, 2009 order for $417,000 worth of product). (*Id.* ¶ 63; *see also id.* ¶ 80.) Before using the product, Energy Deployment conducted its own tests of the product (the same tests that MFS had allegedly completed) and discovered "a myriad of concealed defects, which should have – and certainly could have – been detected by MFS, had MFS truly performed the tests it certified were conducted." (*Id.* ¶ 64.) Energy Deployment then returned the products to plaintiff. Plaintiff paid an additional $75,000 to a third party to have the parts repaired. (*Id.* ¶ 65.) Energy Deployment eventually accepted the repaired products (when they were offered at a "substantial discount" of $200,000), but is no longer a customer of plaintiff. (*Id.*; *see also id.* ¶ 80.)[6]

Another client of plaintiff's, PAS Technologies Ireland Ltd. ("PAS"), contacted plaintiff to place an order for Blade 1. Plaintiff accepted the order (placed on March 30, 2011 in the amount of $340,000), as it had received assurances from MFS that "all issues had been satisfactorily resolved." (*Id.* ¶ 66; *see also id.* ¶ 84.) However, when PAS conducted tests after it received the product, it discovered "substantial defects." (*Id.*) Plaintiff asked MFS to attempt to rectify those defects, which it did, and plaintiff then sent the repaired products to PAS. (*Id.*) PAS

declined to accept those goods, and sent a letter stating, in relevant part, the following:

> The vast majority of these parts have been shown to be defective following these inspections. Ken has already highlighted the defects that were found on the first five parts that were sent to PAS Technologies. The second batch unfortunately was in a similar condition and as such is not suitable to progress through coating. I cannot progress these parts due to the results of the inspections. Unfortunately, we must return these parts to you and cancel the order as the parts are non-conforming and as such we expect our deposit to be returned in full.

(*Id.* ¶ 67.) Because PAS declined to accept delivery of the defective products, it never paid plaintiff the amount plaintiff expected to receive under the contract. (*Id.* ¶ 84.) PAS is now no longer a customer of plaintiff. (*Id.* ¶ 68.) Plaintiff further alleges that, as a direct consequence of MFS's inability to manufacture the product, plaintiff's orders from various other customers have similarly declined in number. (*Id.* ¶ 85.)

5. Kennametal's Acquisition of MFS

On January 18, 2012, MFS informed its customers, including plaintiff, that Kennametal, a manufacturer of transportation parts headquartered in Pennsylvania, was finalizing an acquisition of MFS. (*Id.* ¶ 55.) MFS's letter to its customers, including plaintiff, stated, *inter alia*:

> [w]e share the view that together we can offer a broad range of services and technologies to both of our customer groups and together we can

---

[6] Prior to learning that the products were defective, Energy Deployment had placed an additional order (on August 9, 2009) for Blade 1 in the price of $400,500. (*Id.* ¶ 81.) Energy Deployment proceeded to cancel that order on May 12, 2010, and declined to place any additional orders with plaintiff. (*Id.* ¶ 82.) Plaintiff alleges that, prior to any of the difficulties caused by MFS, Energy Deployment had placed orders in the amount of approximately $1,500,000, which had created a steady flow of income for plaintiff. (*Id.* ¶ 83.)

support our customers' development and business better and better.

(*Id.*) Kennametal acquired MFS (through the acquisition of Deloro Stellite Holdings 1 ("DSH1"), an entity that owned MFS) on March 1, 2012. (*Id.* ¶ 56.)

Shortly after this acquisition, Mott began having contact with Kennametal directly, as Kennametal "controlled and monitored MFS's relationship with its customers." (*Id.* ¶ 57.) Mott contacted William Thalman ("Thalman"), the director of Mergers and Acquisitions and Planning at Kennametal, and reported MFS's delay in "responding to his queries concerning the pending orders and manufacturing of Blade 1." (*Id.* ¶ 58.) As a result, Thalman began participating in conference calls with Mott. He also became "heavily involved in the day-to-day management of the manufacturing of the products and the relationship" with plaintiff. (*Id.* ¶ 59.) As issues emerged concerning plaintiff's orders of Blades 1, 4, and 5, Thalman "attempted resolution of the issues by facilitating communications so that products in compliance with the orders could be delivered." (*Id.* ¶ 60.)

### 6. MFS's Further Acknowledgement of Defects and its Failure to Fulfill Purchase Orders

On March 29, 2012, Keir Lane ("Lane"), MFS's technical director at the time, wrote Mott an e-mail with "bad news" about the Blade 4. (*Id.* ¶ 70.) He explained that, during its inspection of the mold used for the manufacturing of the Blade 4, MFS discovered that the mold had "broken cores." (*Id.*) Lane explained the problem in detail, and concluded that, given MFS's current equipment, MFS did "not have any options to resolve this matter." (*Id.*) Bianchi sent Mott an e-mail that same day, in which he stated the following: "[s]orry David, we

genuinely tried and have no doubt Keir and Scott did their best. Nevertheless looks like this is just difficult for us at least right now." (*Id.* ¶ 71.) Moreover, in an email sent on March 30, 2012, Bianchi explained to Mott that when MFS accepted the purchase orders from plaintiff, MFS had "a technical director that did not recognize the real situation of the parts." (*Id.* ¶ 73.) He further stated that MFS "did several things in order to fix the situation with [its] equipment," and that he could "make a long list of things [they] have done but at the end the result is that in our biz sometimes these things can happen, we are not machining parts but transforming metal form ingots in very complex shaped and cored IGT components, be assured we will not do the same mistake in the future." (*Id.* ¶ 73.)

In an effort to complete the manufacture of Blades 4 and 5, plaintiff hired a new manufacturer, Turbine Castings. (*Id.* ¶ 72.) Blades 4 and 5 were never completed and delivered to plaintiff, preventing plaintiff from selling the products to its customer Turbo Dynamics. (*Id.* ¶ 75.) Mott further voiced his concerns and dissatisfaction with MFS during a conference call with Thelman and Bianchi in July 2012. "Bianchi acknowledged Defendants' numerous failures." (*Id.* ¶ 76.) Mott was later informed, from a former MFS employee, that "MFS's marketing plan was aggressive and included misrepresentations to clients concerning the company's capability to manufacture products with complex specifications." (*Id.* ¶ 77.)

### 7. Plaintiff's Tools

Plaintiff spent over $300,000 to manufacture the tools that it provided to MFS. (*Id.* ¶ 86.) Plaintiff alleges that the tools have a much greater market value than $300,000. (*Id.*) Plaintiff has demanded that defendants return the tools on multiple

occasions, but defendants have refused to do so. (*Id.*) Plaintiff has been unable to manufacture certain parts in the absence of these tools, and has, therefore, failed to meet some of its customers' requests. (*Id.* ¶ 87.)

## B. Procedural History

The complaint in this action was filed on November 29, 2012. On January 22, 2013, defendants requested a pre-motion conference in anticipation of moving to dismiss. The Court granted that request and held a telephone pre-motion conference with the parties on January 31, 2013. At that conference, the Court set a briefing schedule for defendants' motion to dismiss.

Defendants filed their motion on February 22, 2013. Plaintiff filed its opposition on March 22, 2013, and defendants filed a reply in further support of their motion on April 5, 2013. Oral argument was held on April 11, 2013. The Court has fully considered the submissions and arguments of the parties.

## II. STANDARD OF REVIEW[7]

### A. Rule 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). However, prior to discovery, the plaintiff "need only make a *prima facie* showing of jurisdiction through its own affidavits and supporting materials to defeat the motion." *Welinsky v. Resort of the World D.N.V.*, 839 F.2d 928, 930 (2d Cir. 1988) (quoting *Marine Midland*

*Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981). Furthermore, in considering a Rule 12(b)(2) motion, the pleadings and affidavits are to be construed in the light most favorable to plaintiff, the non-moving party, and all doubts are to be resolved in plaintiff's favor. *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 85 (2d Cir. 2011). However, a plaintiff's "unsupported allegations" can be rebutted by "direct, highly specific, testimonial evidence . . . ." *Schenker v. Assicurazioni Generali S.p.A., Consol.*, No. 98 Civ. 9186, 2002 U.S. Dist. LEXIS 12845, at *2 (S.D.N.Y. July 15, 2002).

### B. Rule 12(b)(3)

Enforcement of a forum selection clause is an appropriate basis for a motion to dismiss pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. *See TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 478 (2d Cir. 2011). To survive a Rule 12(b)(3) motion to dismiss, the plaintiff has the burden of pleading venue. *See Cold Spring Harbor Lab. v. Ropes & Gray LLP*, 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011). If the court relies only on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of venue. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005). Thus, if an evidentiary hearing on the question of venue has not been held, "the Court accepts facts alleged in the complaint as true and draws all reasonable inferences in [plaintiff's] favor." *Person v. Google Inc.*, 456 F. Supp. 2d 488, 493 (S.D.N.Y. 2006) (quoting *Caremark Therapeutic Servs. v. Leavitt*, 405 F. Supp. 2d 454, 457 (S.D.N.Y. 2005)); *see also New Moon Shipping Co. v. Man B&W Diesel A.G.*, 121 F.3d 24, 29 (2d Cir. 1997) (explaining that, "at the initial stage of litigation, a party seeking to establish jurisdiction need only make a *prima facie* showing by alleging facts which, if true,

---

[7] Because, for the reasons discussed *infra*, the Court does not reach defendants' Rule 12(b)(6) motion at this time, only the Rule 12(b)(2) and 12(b)(3) standards of review follow.

would support the court's exercise of jurisdiction" (citation omitted)); *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 818 F. Supp. 2d 597, 604 (E.D.N.Y. 2011) ("[A]bsent an evidentiary hearing, the Court must view the facts in the light most favorable to the plaintiff."). The Court is permitted, however, to consider facts outside of the pleadings on a Rule 12(b)(3) motion. *See TradeComet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 375 n.3 (S.D.N.Y. 2010) (explaining that a court, in deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3), "may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction" (citation and internal quotation marks omitted)).

If there are disputed facts relevant to the venue determination, it may be appropriate for the district court to hold an evidentiary hearing before resolving the Rule 12(b)(3) motion. *See New Moon Shipping*, 121 F.3d at 29 ("A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing . . . no disputed fact should be resolved against [the resisting] party until it has had an opportunity to be heard." (citations omitted)); *see also Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004) ("To resolve such motions when genuine factual issues are raised, it may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed facts. Whether to hold a hearing on disputed facts and the scope and method of the hearing is within the sound discretion of the district court." (citations omitted)); *Novak v. Tucows, Inc.*, No. 06-CV-1909 (JFB)(ARL), 2007 U.S. Dist. LEXIS 21269, at *23-24 (E.D.N.Y. Mar. 26, 2007) (conducting an evidentiary hearing to "resolve a disputed material fact as to whether venue is proper in this Court: specifically, whether plaintiff

consented to an agreement with defendant [] that contained a forum selection clause mandating litigation of all related disputes in Ontario, Canada"). If such a hearing is held, the plaintiff has the burden of demonstrating venue by a preponderance of the evidence. *See Gulf Ins. Co.*, 417 F.3d at 355.

## III. DISCUSSION

The Court first analyzes whether it has jurisdiction over MFS, as jurisdiction should be assessed prior to the issue of venue and any consideration of the merits. *See Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (remanding case for "consideration of the issue of jurisdiction over the person of the defendant and, in the event that this be found, the issue of venue, prior to consideration of the merits"). As discussed in detail below, the Court concludes that the motion to dismiss as against MFS for lack of personal jurisdiction is without merit. However, because there are disputed facts relevant to the venue determination, the Court deems it necessary to hold an evidentiary hearing before resolving the Rule 12(b)(3) motion to dismiss for improper venue and the Rule 12(b)(6) motion to dismiss for failure to state a claim.

### A. Personal Jurisdiction

It is well settled that "[i]n diversity or federal question cases the court must look first to the long-arm statute of the forum state, in this instance, New York." *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997). "If the exercise of jurisdiction is appropriate under that statute, the court must then decide whether such exercise comports with the requisites of due process." *Id.* Thus, the district court should engage in a two-part analysis in resolving personal jurisdiction issues: (1) whether New York law would confer jurisdiction by New York courts over

the defendant, and (2) whether the exercise of jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment. *See Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 165 (2d Cir. 2005). "A plaintiff must plead personal jurisdiction with respect to each claim asserted." *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 437 (2d Cir. 2008).

Under New York law, there are two bases for personal jurisdiction over out-of-state defendants: (1) general jurisdiction pursuant to N.Y. C.P.L.R. § 301, and (2) long-arm jurisdiction pursuant to N.Y. C.P.L.R. § 302. Here, plaintiff relies on Section 302, arguing that the Court has long-arm jurisdiction over MFS by virtue of the fact that it contracted to supply goods to New York and, in fact, shipped goods into the state. Plaintiff also argues that jurisdiction over MFS is proper because of MFS's New York activities that rise to the level of transacting business within the state. As set forth below, the Court concludes that plaintiff has made a *prima facie* showing of the Court's long-arm jurisdiction over MFS pursuant to Section 302(a)(1). Moreover, the Court concludes that the exercise of jurisdiction over MFS comports with the Due Process Clause of the Fourteenth Amendment. Accordingly, defendants' motion to dismiss the action as against MFS for lack of personal jurisdiction is denied.

1. Long Arm Jurisdiction[8]

Under N.Y. C.P.L.R. § 302(a),

a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or (3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. C.P.L.R. § 302(a); *see also Overseas Media, Inc. v. Skvortsov*, 277 F. App'x 92, 95 (2d Cir. 2008).

a. Breach of Contract Claim

As to the breach of contract claim, plaintiff argues that the "contracting to supply goods" portion of Section 302(a)(1) establishes personal jurisdiction over MFS because MFS contracted to produce and ship blades to plaintiff in New York. To allege a *prima facie* case of personal jurisdiction under the "contracting to supply goods" prong of Section 302(a)(1), a plaintiff must claim that "'there was a contract to ship goods to New York . . . and goods were shipped under that contract.'" *Great N. Ins. Co. v. Constab Polymer-Chemie GmbH & Co.*, 75 F. App'x 824, 826 (2d Cir. 2003)

---

[8] Because plaintiff does not argue that Section 301 provides a basis for jurisdiction over MFS, and because, as discussed *infra*, the Court concludes that plaintiff has made a *prima facie* showing of Section 302(a)(1) long-arm jurisdiction over MFS, the Court does not engage in a general jurisdiction analysis.

(quoting *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 37 (2d Cir. 2001)). In addition, the cause of action must arise from those in-state activities. *Id.* "Thus, even if a defendant never enters the state to negotiate [the] contract, to complete performance or for any other reason, the second prong of § 302(a)(1) can provide long-arm jurisdiction over a defendant who has minimal contacts with the state and who has entered a contract anywhere to supply goods or services in the state." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 789 (2d Cir. 1999).

Plaintiff alleges that, pursuant to the parties' agreement, MFS was to provide the blades to plaintiff in New York. (*See, e.g.*, Compl. ¶¶ 13, 20.) Plaintiff also alleges that MFS in fact shipped blades (albeit, defective ones) to plaintiff in New York pursuant to the contract. (*See id.* ¶¶ 36, 62.) Moreover, it is clear that plaintiff's breach of contract claim arises from MFS's agreement to ship blades of a certain number and quality to New York and its subsequent failure to adequately perform. Plaintiff has, therefore, made a *prima facie* showing of personal jurisdiction over MFS under the "contracting to supply goods" prong of Section 302(a)(1) for purposes of its breach of contract claim. *See, e.g.*, *Great N. Ins.*, 75 F. App'x at 826-27 (finding personal jurisdiction under "contracting to supply goods" prong of Section 302(a)(1) where supply contract provided for the regular delivery of products to New York and defendant sent invoices for orders directly to New York); *Mario Valente Collezioni*, 264 F.3d at 37 ("As there was a contract to ship goods to New York, entered into by plaintiff and defendants, and goods were shipped under that contract, the district court correctly concluded jurisdiction was proper."); *Cleopatra Kohlique, Inc. v. New High Glass, Inc.*, 652 F. Supp. 1254, 1257

(E.D.N.Y. 1987) (finding the requirements of the "contracting to supply goods" prong of Section 302(a)(1) to be met when it was clear that the parties entered into a contract outside of New York for the supply of goods to New York, the claim arose out of that contract, and defendant "knowingly and intentionally shipped the goods, or a portion thereof, to New York"); *Alan Lupton Assocs. v. Ne. Plastics, Inc.*, 482 N.Y.S.2d 647, 651 (4th Dep't 1984) ("In the present case, we view the shipment by defendant of 6,000 plastic buttons to Binghamton, New York, based upon an order solicited by the plaintiff pursuant to the contract as an act by which defendant has voluntarily and purposely availed itself of the privilege of transacting business in New York State.").[9]

---

[9] Defendants contend that the "totality of the circumstances" – including the fact that MFS accepted the orders in Italy, manufactured the blades in Italy, and accepted payments in Italy – precludes the exercise of jurisdiction over MFS under Section 302(a)(1). (*See* Mem. of Law in Support of Defs.' Mot. to Dismiss ("Defs.' Mot.") at 15-16.) The Court finds this argument unpersuasive. The "totality of the circumstances" analysis must be undertaken by courts assessing whether personal jurisdiction exists under the "transacting business" prong of Section 302(a)(1). *See Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004) (listing several factors that courts should consider in determining whether an out-of-state defendant transacts business in New York in such a way that it constitutes purposeful activity and noting that no one factor is dispositive – "the ultimate determination is based on the totality of the circumstances"). However, "such weighing is unnecessary under the more specific 'contracting to supply goods' prong where there is an express contract to ship goods to New York, as such a contract falls squarely within the statutory grant of jurisdiction." *Great N. Ins.*, 75 F. App'x at 826 (citations omitted); *see also id.* n.4 ("The 'transacting business' and 'contracting to supply goods' prongs of C.P.L.R. § 302(a)(1) are analyzed separately and either can form a basis for the exercise of personal jurisdiction" (citation and internal quotation marks omitted)). Accordingly, defendants' "totality of the circumstances" argument does not alter the Court's analysis as to jurisdiction over MFS on the breach of

Plaintiff also argues that the "transacting business" prong of Section 302(a)(1) provides a basis for the Court's exercise of personal jurisdiction over MFS. To establish personal jurisdiction under the "transacting business" prong of Section 302(a)(1), "two requirements must be met: (1) [t]he defendant must have transacted business within the state; and (2) the claim asserted must arise from *that* business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006) (emphasis added) (citing *McGowan v. Smith*, 52 N.Y.2d 268 (1981)). The statute allows jurisdiction "only over a defendant who has 'purposefully availed himself of the privilege of conducting activities within New York and thereby invoked the benefits and protections of its laws.'" *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000) (quoting *Parke-Bernet Galleries v. Franklyn*, 26 N.Y.2d 13, 18 (1970)). Several factors should be considered in determining whether an out-of-state defendant transacts business in New York in such a way that it constitutes purposeful activity so as to satisfy the first step of the test, including:

> (i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [defendant] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state.

*Sunward Elecs.*, 362 F.3d at 22 (quoting *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996)). Additionally, courts have considered whether the contract was executed in New York. *See Berkshire Capital Grp., LLC v. Palmet Ventures, LLC*, 307 F. App'x 479, 480 (2d Cir. 2008). None of these factors is dispositive; "the ultimate determination is based on the totality of circumstances." *Sunward Elecs., Inc.*, 362 F.3d at 22. "As for the second part of the test, a suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation and internal quotation marks omitted). "'A connection that is 'merely coincidental' is insufficient to support jurisdiction.'" *Id.* at 249 (quoting *Sole Resort*, 450 F.3d at 103).

Here, plaintiff alleges that there were multiple agreements between plaintiff and MFS that required MFS to send blades to New York (*see*, *e.g.*, Compl. ¶¶ 13, 20), and that, pursuant to those agreements, MFS shipped goods to plaintiff's headquarters in New York (*see*, *e.g.*, Mott Decl. ¶ 11). These allegations indicate that the parties were a part of an on-going contractual relationship focused on the forum state. *See, e.g.*, *Sunward Elecs.*, 362 F.3d at 23. Moreover, although defendants contend that the contracts at issue were not negotiated in New York (*see* Defs.' Mot. at 14), plaintiff alleges that significant contract negotiations

---

contract claim under the "contracting to supply goods" prong of Section 302(a)(1). Even if the totality of the circumstances consideration applied to the "contracting to supply goods" prong, the Court would still conclude that personal jurisdiction exists for the reasons discussed *infra* as to the "transacting business" prong.

took place between the parties within the state. For example, prior to the execution of the agreements, Tuzi traveled to plaintiff's headquarters in New York to discuss MFS's ability to manufacture the blades in an effort to convince plaintiff to enter into a contractual relationship with MFS (*see* Compl. ¶ 25; *see also* Mott. Decl. ¶ 5), and it was allegedly Tuzi's visit that ultimately convinced plaintiff to place its First Purchase Order with MFS (*see* Compl. ¶ 25). No contractual or business relationship between the parties existed before this meeting occurred; it was only after the meeting transpired that plaintiff initiated the first of many business agreements between the parties. Plaintiff has thus alleged that Tuzi's New York meeting "substantially advanced" the formation of the contract and business relationship between plaintiff and MFS so as to establish personal jurisdiction over MFS. *See*, *e.g.*, *SAS Grp, Inc. v. Worldwide Inventions, Inc.*, 245 F. Supp. 2d 543, 549 (S.D.N.Y. 2003) ("[C]ontract negotiations in New York will satisfy § 302(a)(1) if the discussions 'substantially advanced' or were 'essential to' the formation of the contract or advanced the business relationship to a more solid level." (alteration, citation, and quotation marks omitted)); *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1531 (S.D.N.Y. 1985) ("Preliminary negotiations in New York that are 'essential to the existence of the contract' provide sufficient contact to establish New York's personal jurisdiction over the non-domiciliary defendant.").[10] Further, plaintiff allegedly

assisted MFS from New York during the course of the agreements, as plaintiff repeatedly supplied MFS with tools (and, in some instances, additional replacement tools) to use during its manufacture of the blades. *See*, *e.g.*, *Sunward Elecs.*, 362 F.3d at 24 (finding relevant to the Section 302(a)(1) "transacting business" analysis the fact that the New York "Plaintiff continuously supervised and assisted Defendants during the term of the Dealership Agreement . . . [by] provid[ing] Defendants with training materials and other proprietary information to be used in selling, marketing, installing and maintaining [the] products").

In opposing personal jurisdiction pursuant to the "transacting business" prong of Section 302(a)(1), defendants argue, *inter alia*, that MFS "did not have a physical presence in New York" and that the agreements between the parties did not contain New York choice-of-law-clauses. (*See* Defs.' Mot. at 14.) As to defendants' arguments relating to MFS's presence in New York, "proof of one transaction, or a single act, in New York" has been deemed "sufficient to invoke long-arm jurisdiction even though the defendant never enters New York." *Best Van Lines*, 490 F.3d at 248 (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)) (alteration and internal quotation marks omitted). "Thus, even when physical presence is lacking, jurisdiction may still be proper if the defendant on his or her own initiative . . . projects himself or herself into this state to engage in a sustained and substantial transaction of business." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 382 (2007) (citation and internal quotation marks omitted). Because, as discussed *supra*, substantial negotiations, which led to an on-

---

[10] Even assuming *arguendo* that the "meeting in New York was solely for the purpose of conducting a demonstration and no negotiations took place during the meeting," jurisdiction would be properly asserted here because "the only conceivable purpose of the demonstration was to foster a more solid relationship, if not a contract, with respect to" plaintiff and MFS. *SAS Grp.*, 245 F. Supp. 2d at 549 (quoting *Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*, 600 F.

Supp. 731, 736-37 (E.D.N.Y. 1985)) (internal quotation marks omitted).

going contractual and business relationship between the parties, allegedly took place in New York and MFS continued to communicate with plaintiff and enter into multiple additional contracts to provide goods to New York, this is one of those cases where the nature and quality of MFS's contacts with the forum state, as alleged, support long-arm jurisdiction even though MFS did not maintain a New York presence. In terms of the lack of a New York choice-of-law clause, although the existence of such a clause is a "significant" factor in a personal jurisdiction analysis, *see Sunward Elecs,*, 362 F.3d at 23, the absence of one has no bearing on the issue of personal jurisdiction, *see, e.g., Sandoval v. Abaco Club*, 507 F. Supp. 2d 312, 317-18 (S.D.N.Y. 2007) (explaining that the lack of a choice-of-law clause in the contract at issue had no affect on the personal jurisdiction analysis). Thus, defendants' first two arguments do not affect the "transacting business" analysis.

Defendants also argue that the fact that MFS representatives participated in telephone conferences and videoconferences with plaintiff's representatives in New York is not sufficient to establish jurisdiction. Although the Court recognizes that contact through the phone or by mail is generally insufficient to confer personal jurisdiction, *see, e.g., Kahn Lucas Lancaster Inc. v. Lark Int'l Ltd.*, 956 F. Supp. 1131, 1135 (S.D.N.Y. 1997), the Court is instructed to analyze a defendant's transacting of business in light of the totality of the circumstances for purposes of Section 302(a)(1). Thus, although the telephone and video communications between plaintiff and MFS may not, standing alone, create a basis for personal jurisdiction over MFS, the Court's analysis is based on the totality of the circumstances, *see Sunward Elecs., Inc.*, 362 F.3d at 22, which, for the reasons discussed *supra*, indicate that MFS's

contacts with New York, as alleged, were purposeful enough to confer personal jurisdiction under Section 302(a)(1).[11] The Court concludes, therefore, that, based on a consideration of the totality of the circumstances, plaintiff has sufficiently established that MFS was "transacting business" within New York so as to satisfy the first prong of the Section 302(a)(1) analysis.

With respect to the second, "arising under" prong of the Section 302(a)(1) analysis, the Court finds that plaintiff has met its burden of showing that the breach of contract claim arose out of MFS's New York business transactions. The breach of contract cause of action is based on MFS's alleged proffer of defective blades and failure to provide certain goods in violation of the terms of the agreements between the parties. (*See* Compl. ¶ 90.) Viewing MFS's alleged New York business activities in connection with the contracts upon which this lawsuit is based, the Court concludes that there is a substantial nexus between those activities – including the significant contract negotiations that took place in New York and the shipment of materials into and out of New York – and the alleged breach. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 60 (2d Cir. 1985) (concluding, after a consideration of the totality of the circumstances, that there is a "substantial nexus" between "defendants' activities in New York in connection with the matter giving rise to the lawsuit" and

---

[11] To the extent defendants also argue that personal jurisdiction over MFS is improper because payments on the contracts were made outside of New York, that argument fails for the same reason. There is no one dispositive factor in the personal jurisdiction analysis. Instead, the Court considers the totality of the circumstances, which, as alleged in this case, are sufficient to establish that MFS was "transacting business" in New York so as to purposefully avail itself of the laws of the State.

"the alleged breach of the franchise agreement"). Thus, having considered the totality of the alleged circumstances concerning MFS's connections to New York, the Court concludes that MFS "transacted business" in New York in such a purposeful manner as to avail itself of the laws of New York with respect to its breach of contract claim. *See Fort Knox Music*, 203 F.3d at 196.

Thus, for all of the reasons discussed above, the Court concludes that the requirements of Section 302(a)(1) – both under the "contracting to supply goods" and the "transacting business" prongs – have been met as to MFS on the breach of contract claim.

### b. The Tort Claims

Having determined that the 302(a)(1) requirements have been met as to MFS in the context of plaintiff's breach of contract claim, the Court turns to plaintiff's tort claims. *See Interface Biomedical Labs.*, 600 F. Supp. at 734 (explaining that the district court must "determine the issue of personal jurisdiction separately for each cause of action asserted in the plaintiff's complaint" (alteration, citation, and quotation marks omitted)). For the reasons that follow, the Court concludes that MFS's alleged actions that were sufficient to constitute "transacting business" in New York for the breach of contract claim also suffice to satisfy Section 302(a)(1) for plaintiff's tort claims.

A court may not simply conclude that personal jurisdiction over a defendant must exist as to all claims asserted in a complaint because the "transacting business" prong of Section 302(a)(1) has been satisfied in the context of a particular claim. This is because the "transacting business" prong of Section 302(a)(1) has an "arising under" component, requiring that the claim asserted *arise from*

the defendant's New York business activities. *See*, *e.g.*, *SAS Grp.*, 245 F. Supp. 2d at 550 ("In other words, the fact that [defendant's] New York activities were sufficient to establish jurisdiction over the breach of contract claim does not mean that every cause of action that [plaintiff] may feasibly assert necessarily 'arises from' those activities."). "A plaintiff's cause of action 'arises from' a defendant's New York activities when those activities are 'substantially proximate to the allegedly unlawful acts.'" *Id.* (quoting *Xedit Corp. v. Harvel Indus. Corp.*, 456 F. Supp. 725, 729 (S.D.N.Y. 1978)). Such a determination "'is necessarily one of degree, informed by considerations of public policy and fundamental fairness.'" *Id.* (quoting *Xedit Corp.*, 456 F. Supp. at 729). Courts in this Circuit have found a plaintiff's tort causes of action to "arise from" a defendant's contacts with New York even when those contacts revolve around a contractual relationship. *See*, *e.g.*, *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 206 (S.D.N.Y. 2002) (finding that because plaintiff's tort claims concern defendant's conduct towards plaintiff and its clients, the defendant's "transaction of business in New York is sufficiently related to the claims asserted to justify the exercise of personal jurisdiction").

Here, the tort claims plaintiff asserts against MFS are negligent misrepresentation, fraud, and replevin. Plaintiff's negligent misrepresentation and fraud claims are based on the allegations that MFS made false representations about its ability to produce the blades plaintiff desired in order to entice plaintiff to enter into numerous, expensive agreements for those blades (*see* Compl. ¶¶ 95-96, 100-01), and that MFS falsified the assessment reports that it sent to plaintiff along with the blades in order to induce plaintiff to accept delivery of defective products (*see id.* ¶ 97).

As discussed *supra*, plaintiff alleges that Tuzi traveled to New York to persuade plaintiff to purchase blades from MFS (*see id.* ¶ 25; *see also* Mott. Decl. ¶ 5), and that plaintiff began a contractual relationship with MFS as a result of Tuzi's representations about MFS's experience and ability to produce the product (*see* Compl. ¶ 25). Plaintiff also alleges that, pursuant to each agreement between the parties, and as is customary in the industry, MFS inspected the blades produced and created reports detailing the positive results of its testing prior to sending the blades to plaintiff. (*Id.* ¶ 23.) Having received only defective goods that could not pass industry inspections, plaintiff now argues that it has been harmed by all of those false and/or fraudulent representations. Thus, the Court concludes that MFS's alleged negligent misrepresentations and fraud are substantially proximate to its New York business activities discussed in the context of the breach of contract claim – namely, a New York meeting during contract negotiations where it made representations about its experience and ability to manufacture blades in order to initiate a contractual relationship with plaintiff and its subsequent shipment of goods and inspection reports to New York. *See*, *e.g.*, *SAS Grp.*, 245 F. Supp. 2d at 551 (finding New York activities that constituted "transacting business" for purposes of a breach of contract claim – substantial contract negotiations that occurred in New York – sufficient in the context of an unjust enrichment claim because the unjust enrichment claim arose out of payments made under the contract negotiated); *GB Mktg. USA, Inc. v. Gerolsteiner Brunnen GmbH & Co.*, 782 F. Supp. 763, 771 (W.D.N.Y. 1991) ("[T]he combined effect of [defendant's New York] activities was, allegedly, to create a potentially long-lasting business relationship between [the parties],

pursuant to which [plaintiff] undertook to promote the sale of [defendant's] product. It is out of that relationship that [plaintiff's promissory estoppel, quantum meruit, and unjust enrichment] claims arise."); *Hedlund v. Prods. from Sweden, Inc.*, 698 F. Supp. 1087, 1091 (S.D.N.Y. 1988) (finding nexus between plaintiff's tort claim and defendant's contract negotiations in New York).

As to plaintiff's replevin claim, that claim is based on MFS's alleged failure to return tools to plaintiff. (*See* Compl. ¶¶ 105-07.) Pursuant to the agreements between the parties, plaintiff allegedly provided MFS with tools that MFS needed to manufacture the blades plaintiff had ordered. (*See id.* ¶ 22; Bianchi Decl. Ex. B, Order Confirmation from MFS ("Tooling will arrive in MFS in November 2008 . . . .").) Plaintiff now argues that, despite its requests that those tools be returned, MFS has continued to retain unlawful possession of the tools. Construing the facts alleged in the light most favorable to plaintiff, the Court finds that, because the provision of tools is allegedly governed by the parties' contracts, there exists a nexus between plaintiff's replevin cause of action and MFS's New York contract negotiations.[12]

In sum, long-arm jurisdiction over MFS on plaintiff's tort claims is proper under the "transacting business" prong of Section 302(a)(1).

---

[12] Moreover, the fact that the tools are allegedly being held by MFS outside of New York does not alter the Court's analysis. *See*, *e.g.*, *United Feature Syndicate*, 216 F. Supp. 2d at 206 ("Claims sounding in tort may properly 'arise from' the transaction of business in New York, even when the acts underlying the cause of action took place outside of New York, as long as they are sufficiently related to that transaction of business.").

2. Requirements of Due Process

Having concluded that there is adequate basis for the exercise of long-arm jurisdiction over MFS on all of plaintiff's claims, the Court must next determine whether the exercise of jurisdiction over MFS comports with the Due Process Clause of the Fourteenth Amendment, which requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985); *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he defendant's conduct and connection with the forum state [must be] such that he should reasonably anticipate being haled into court there."). There are two aspects of the due process analysis: (1) the minimum contacts inquiry, and (2) the reasonableness inquiry. *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 171 (2d Cir. 2010). Although the constitutional due process issue is a separate question, "[o]rdinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits." *Topps Co. v. Gerrit J. Verburg Co.*, 961 F. Supp. 88, 90 (S.D.N.Y. 1997).

The Court first turns to the minimum contacts analysis. Because plaintiff has alleged that MFS engaged in contract negotiations in New York, and that MFS agreed to ship goods to New York and actually sent goods into the State pursuant to the contracts negotiated, the Court finds that, if these allegations are proven, it would have been reasonably foreseeable to MFS that it would be subjected to suit in New York State. *See, e.g.*, *Burger King*, 471 U.S. at 473 (explaining that, for purposes of the due process analysis and "with respect to interstate contractual obligations, we have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities" (citation and internal quotation marks omitted)); *Chloe*, 616 F.3d at 171 ("In actually sending items to New York, there can be no doubt that [defendant's] conduct was purposefully directed toward the forum State." (citation, emphasis, and internal quotation marks omitted)). Thus, by engaging in the New York-related activities discussed *supra*, MFS would have been purposefully availing itself of the privilege of conducting activities in this State. *See Chloe*, 616 F.3d at 171 (concluding that "assertion of personal jurisdiction over [defendant] comports with due process for the same reasons that it satisfies New York's long-arm statute"). Accordingly, the Court concludes that MFS's alleged purposeful contacts with New York are sufficient to satisfy the "minimum contacts" inquiry of the due process analysis.

With respect to the reasonableness inquiry, even where an out-of-state defendant is deemed to have purposefully availed himself of the forum state, a plaintiff "must still demonstrate that the exercise of jurisdiction does not 'offend traditional notions of fair play and substantial justice' and is thus reasonable under the Due Process Clause." *Id.* at 172-73 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)). As set forth by the Supreme Court, courts should consider five factors when determining the reasonableness of a particular exercise of jurisdiction:

> A court must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief.

It also must weigh in its determination [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and [5] the shared interest of the several States in furthering fundamental substantive social policies.

*Asahi Metal Indus.*, 480 U.S. at 113 (citation and internal quotation marks omitted). "Where the other elements for jurisdiction have been met, dismissals on reasonableness grounds should be 'few and far between.'" *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 246 (S.D.N.Y. 2010) (quoting *Metro. Life Ins.*, 84 F.3d at 575).

With respect to the first factor, there is undoubtedly some burden on MFS if it is forced to travel to New York for trial. "The inconvenience, however, cuts both ways since all of [plaintiff's] witnesses would have to travel to [Italy] if the case were brought there." *Chloe*, 616 F.3d at 173 (citing *Bank Brussels*, 305 F.3d at 129-30 ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.")); *see also Metro. Life Ins.*, 84 F.3d at 574 (finding that, although the burden on the defendant factor "cuts slightly in favor of the defendant" because its records, files, and witnesses are all located outside the forum where the case was brought, given the advent of "modern communication and transportation," that factor, taken alone, "falls short of overcoming the plaintiff's threshold showing of minimum contacts"). The second factor favors keeping New York as the forum state, since "a state frequently has a

'manifest interest in providing effective means of redress for its residents,'" *Chloe*, 616 F.3d at 173 (quoting *Burger King*, 471 U.S. at 483), as does the third factor, since plaintiff's headquarters are in New York and its witnesses are located there. The fourth factor favors New York as well, as plaintiff has brought its claims (against both defendants in this case – MFS and Kennametal) in New York and exercising jurisdiction over MFS will "enable the efficient resolution of plaintiff['s] claims in a single proceeding." *Dandong v. Pinnacle Performance Ltd.*, 10 Civ. 8086 (JMF), 2013 U.S. Dist. LEXIS 119567, at *24 (S.D.N.Y. Aug. 22, 2013) (alteration, citation, and internal quotation marks omitted). The final factor is neutral. The Court finds, therefore, that asserting jurisdiction over MFS "comports with traditional notions of fair play and substantial justice, such that it satisfies the reasonableness inquiry of the Due Process Clause." *Chloe*, 616 F.3d at 173 (citation and internal quotation marks omitted).

Having conducted the requisite minimum contacts and reasonableness inquiries, the Court concludes that its exercise of jurisdiction over MFS comports with the principles of due process.

\*\*\*

In sum, construing the pleadings in the light most favorable to plaintiff, the nonmoving party, and resolving all doubts in its favor, the Court concludes that plaintiff has adequately alleged a *prima facie* case of personal jurisdiction over MFS. Accordingly, defendants' Rule 12(b)(2) motion to dismiss as against MFS for lack of personal jurisdiction is denied.

## B. Venue

The Court next turns to defendants' motion to dismiss for improper venue. For the reasons discussed below, the Court concludes that, because there are disputed facts relevant to the venue determination in this case, the Court must hold an evidentiary hearing before resolving the pending Rule 12(b)(3) motion.

Defendants argue that the case should be dismissed for improper venue because a forum selection clause contained within the contracts between plaintiff and MFS makes the courts of Milan, Italy the exclusive forum for any disputes. (Defs.' Mot. at 7.) "The enforcement of forum selection clauses in international disputes is governed by *M/S Bremen v. Zapata Off-Shore Co.*, 507 U.S. 1 (1972)." *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009). In *M/S Bremen*, the Supreme Court held that mandatory forum selection clauses (in which parties agree in advance that their contract will be governed exclusively by the laws of a particular forum) are entitled to a presumption of enforceability unless "enforcement would be unreasonable and unjust, or . . . the clause was invalid for such reasons as fraud or overreaching." 507 U.S. at 15. A forum selection clause can bind the parties even where the agreement in question is a form consumer contract that is not subject to negotiation. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589-95 (1991). Such clauses will be enforced only if found to be exclusive or mandatory. *See John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imp. & Distrib., Inc.*, 22 F.3d 51, 52-53 (2d Cir. 1994).

It is clear, based on the language of the forum selection clause at issue, that the choice of forum is mandatory, as specific language regarding venue is included in the clause, specifying that "any legal claim or any other controversy will be subject to the exclusive jurisdiction of the Court of Milan" (Bianchi Decl. Ex. G, Translation of General Terms & Conditions of Supply). *See, e.g.*, *John Boutari & Son*, 22 F.3d at 53; *Cent. National-Gottesman, Inc. v. M.V. Gertrude Oldendorff*, 204 F. Supp. 2d 675, 678 (S.D.N.Y. 2002) ("For a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language."). It is not clear, however, based on the information currently before the Court, whether plaintiff in fact consented to an agreement with defendants that contained this mandatory forum selection clause.

The parties agree that the United Nations Convention on Contracts for the International Sale of Goods ("CISG") governs the substantive question of contract formation in this case. *See Golden Valley Grape Juice & Wine, LLC v. Centrisys Corp.*, No. CV F 09-1424 LJO GSA, 2010 U.S. Dist. LEXIS 11884, at *8 (E.D. Cal. Jan 22, 2010) ("The CISG governs only the formation of the contract of sale, and the rights and obligations of the seller and the buyer arising from such a contract."). Thus, the CISG governs whether and when the forum selection clause at issue became a part of the parties' agreement. In situations where a forum selection clause was imposed before a contract formed under the CISG (*i.e.*, as a part of an offer or counter-offer that was later accepted), courts have deemed the forum selection clause to be a part of the parties' consented to agreement. *See, e.g.*, *id.* at *16-17 ("The evidence establishes that at the time [plaintiff] sent its sales quote to [defendant], it contemporaneously sent its General Conditions [– which included a forum selection clause –] as part of the attachments. By adopting the terms of the sales quote, [defendant] accepted the terms upon which the [goods] had been offered, including the General Conditions. Thus,

[defendant] accepted the General Conditions," including the forum selection clause at issue.). Courts have also deemed forum selection clauses interposed subsequent to contract formation to be a part of the agreement in cases where the other party assented to the clause's inclusion. *See*, *e.g.*, *BTC-USA Corp. v. Novacare*, Civ. No. 07-3998 ADM/JSM, 2008 U.S. Dist. LEXIS 46714, at *9-10 (D. Minn. June 16, 2008) (finding that plaintiff "expressed its assent to the forum selection clause['s] . . . material alteration of the oral contract" between the parties by initialing the general conditions of sale provided by defendant). However, where a party has unilaterally sought to add a forum selection clause after the parties already formed their agreement under the CISG, courts have held that the forum selection clause does not constitute a modification of the contract agreed to by the parties. *See*, *e.g.*, *Chateau Des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003) (holding that because "[a] contract is concluded at the moment when an acceptance of an offer becomes effective" under the CISG, complete and binding contracts were formed between the parties when they reached oral agreements on price and quantity, and that subsequent invoices containing forum selection clauses sent by one party merely constituted an attempt to modify the contracts, which cannot be done unilaterally under the CISG (citation and internal quotation marks omitted)); *Solae, LLC v. Hershey Canada, Inc.*, 557 F. Supp. 2d 452, 458 (D. Del. 2008) (holding that parties formed a completed contract under the CISG in 2006 – when they reached an agreement on price, quantity, and freight terms – and that a forum selection clause contained in Conditions of Sale that were introduced unilaterally and subsequent to the formation of the 2006 contract did modify that contract under the CISG); *cf. CSS Antenna, Inc. v.*

*Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 754 (D. Md. 2011) (concluding that, although the order confirmations containing general conditions that defendant sent to plaintiff constituted counteroffers, because there was no evidence indicating that plaintiff had actual knowledge of the general conditions or the fact that defendant intended those conditions to be incorporated into the parties' contract, the forum selection clause contained within the general conditions could not be deemed a part of the contract for purposes of a motion to dismiss for improper venue).

Here, defendants claim that, upon receipt of a purchase order from plaintiff, MFS issued a written order confirmation, which constituted its acceptance of the order. (*See* Bianchi Decl. ¶ 13.) The written order confirmation contained MFS's General Terms and Conditions of Supply, which included the mandatory forum selection clause at issue. (*See id.*; *see also* Bianchi Decl. Ex. G.) According to defendants, MFS sent a written order confirmation containing the forum selection clause to plaintiff after (and in response to and acceptance of) each purchase order it received from plaintiff. (*See* Bianchi Decl. ¶¶ 14-18; *see also* Bianchi Decl. Exs. B-F.) Plaintiff maintains, however, that MFS's practice was to call plaintiff and confirm each of the purchase orders via telephone. (Mott Decl. ¶ 12.) Plaintiff claims that MFS sent written confirmations only in "some cases" and did so several months after it received the purchase orders. (*Id.*) Plaintiff also claims that, in certain instances, the written confirmations were sent via email and were not accompanied by any terms and conditions (and, therefore, did not include the forum selection clause at issue). (*Id.*; *see also* Mott Decl. Ex. 3, Email Exchange & Order Confirmation.) Disputed issues of fact clearly exist with regard to the forum selection clause in question – namely,

whether plaintiff received the clause and, if so, whether receipt occurred during or subsequent to contract formation. Given these disputed issues of fact, the Court cannot determine whether the parties in fact contracted to exclusive venue in Italy, let alone if the clause (in the event it is deemed to be a part of their agreement) is entitled to a presumption of enforceability, without first holding an evidentiary hearing.[13]

Defendants alternatively request that the Court dismiss this case under the doctrine of *forum non conveniens*. The doctrine of *forum non conveniens* "affords a trial court discretion in a case over which it has jurisdiction to decline to exercise it, whenever it appears that such case may be more appropriately tried in another forum, either for the convenience of the parties or to serve the ends of justice." *Pollux Holding*

*Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003). In *Gulf Oil Corp. v. Gilbert*, the Supreme Court outlined a multitude of factors that should be considered when applying the doctrine of *forum non conveniens*. 330 U.S. 501, 508-09 (1947) (detailing various private interest factors – including, "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive" – and public interest factors – including, administrative difficulties; the potential imposition of jury duty on people within a community that has no relation to the litigation; the local interest in having localized controversies decided at home; and conflict of laws issues – that courts should consider when conducting a *forum non conveniens* analysis), *superseded by statute on other grounds*. Based on those factors, the Second Circuit articulated a three-step analysis that district courts should engage in to determine whether dismissal for *forum non conveniens* is appropriate:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

*Norex Petroleum, Ltd. v. Access Indus.*, 416 F.3d 146, 153 (2d Cir. 2005) (citations omitted).

---

[13] In *Evolution Online Systems, Inc. v. Koninklijke PTT Nederland N.V.*, the Second Circuit vacated a district court's dismissal of a complaint for improper venue where the district court determined that the parties had reached agreement on a forum selection clause without first making a finding that a contract existed between the parties. 145 F.3d 505, 509 (1998). The Second Circuit explained that the district court's finding in regards to the forum selection clause was "premature" because if no contract exists between the parties, a forum selection clause mandating that disputes arising from such a contract take place outside of the United States could not deprive plaintiff of its right of access to the courts of the United States. *Id.* The Second Circuit remanded the case, instructing the district court to first analyze whether the parties entered into a contract, then consider whether that contract contains a forum selection clause, and, if so, address whether application of the clause to plaintiff's claim is proper. *Id.* Given the disputed issues of fact that exist with respect not only to the forum selection clause at issue in this case, but also to the trajectory of contract formation (or lack thereof) between the parties (*i.e.*, whether the MFS accepted plaintiff's purchase orders via telephone or whether MFS sent written confirmations with additional terms that constituted counter-offers to plaintiff's initial offers), the Court defers the requisite, contract existence analysis until after it conducts the evidentiary hearing.

However, the Second Circuit has instructed that "[o]nly when 'the *M/S Bremen* presumption of enforceability does not apply' to a forum selection clause may a court engage in 'the traditional *forum non conveniens* standards articulated by the Supreme Court in *Gulf Oil* . . . .'" *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 12-3535-cv, 2013 U.S. App. LEXIS 12639, at *4 (2d Cir. June 20, 2013) (emphasis added) (quoting *Aguas Lenders Recovery Grp.*, 585 F.3d at 700). For the reasons discussed *supra*, the Court is unable to determine, at this juncture, whether or not the parties' contracts contain a valid and enforceable forum selection clause and, as a result, cannot discern whether or not the *M/S Bremen* presumption of enforceability applies. Thus, because of the disputed facts that exist with regard to the forum selection clause issue, the Court also cannot engage in a *forum non conveniens* analysis prior to conducting an evidentiary hearing.

For all of these reasons, the Court will hold an evidentiary hearing in connection with defendants' Rule 12(b)(3) motion.[14]

IV. CONCLUSION

For the foregoing reasons, defendants' Rule 12(b)(2) motion to dismiss as against MFS for lack of personal jurisdiction is denied. The Court will conduct an evidentiary hearing in connection with defendants' Rule 12(b)(3) motion before deciding defendants' Rule 12(b)(3) and Rule 12(b)(6) motions.

SO ORDERED.

_____

JOSEPH F. BIANCO
United States District Judge

Dated: September 4, 2013
       Central Islip, NY

* * *

Plaintiff is represented by Edward L. Birnbaum of Herzfeld & Rubin, P.C., 40 Wall Street, New York, N.Y. 10005 and Lydia Ferrarese and Mark A. Weissman of Herzfeld & Rubin, P.C., 125 Broad Street, New York, N.Y. 10017. Defendants are represented by Thomas J. Hall and Stacey Lynn Trimmer of Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, 10112.

---

[14] The Court will defer ruling on defendants' Rule 12(b)(6) motion until it has conducted the evidentiary hearing and fully considered the issue of venue. *See Arrowsmith*, 320 F.2d at 234 (remanding case to district court for venue determination "before any further consideration of the merits").