ALLIED DYNAMICS CORP.,

Plaintiff,

VERSUS

KENNAMETAL, INC. AND KENNAMETAL STELLITE, FORMERLY KNOWN AS
MICROFUSIONE STELLITE S.P.A.,

Defendants.
───────────────

**MEMORANDUM AND ORDER**
August 5, 2014
───────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff Allied Dynamics Corporation ("plaintiff" or "Allied") brings this action against Kennametal, Inc. ("Kennametal") and Kennametal Stellite, formerly known as Microfusione Stellite S.p.A., ("MFS") (collectively, "defendants"), alleging causes of action for breach of contract, negligent misrepresentation, fraud, and replevin. This case relates to the business relationship that began in 2007 between Allied, a corporation headquartered in New York, and MFS, a company doing business in Italy. Allied, which engineers and manufactures turbine parts, sought to purchase blade parts from MFS for gas turbine assembly. In alleged reliance on MFS's representations about its experience producing the blades plaintiff desired and MFS's ability to manufacture blades in the quantity and quality plaintiff required, plaintiff issued various purchase orders to MFS. According to plaintiff, MFS failed to provide goods of the quantity and quality promised. Thereafter, plaintiff initiated this lawsuit, alleging that MFS and its parent company, Kennametal, breached their contracts for the provision of blades to plaintiff, negligently and fraudulently misrepresented both their ability to perform under the contracts and the quality of the goods that they sent to plaintiff pursuant to the contracts, and have retained unlawful possession of tools that plaintiff sent them to aid in their manufacture of the blades.

Now pending before the Court is the balance of defendants' motion to dismiss. On September 4, 2013, the Court denied the motion to dismiss MFS for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, but deferred deciding whether to dismiss for improper venue pursuant to Rule 12(b)(3) (or, in the alternative, under the doctrine of *forum non conveniens*), and for failure to state a claim pursuant to Rule 12(b)(6). *Allied Dynamics Corp. v. Kennametal, Inc.*,

1

965 F. Supp. 2d 276 (E.D.N.Y. 2013). The Court concluded that an evidentiary hearing was necessary because disputed issues of fact existed with regard to the trajectory of contract formation and whether the forum selection clause was part of the parties' contracts. The Court held the hearing on December 10, 2013, and the parties have submitted supplemental briefs addressing the evidence presented during the hearing.

For the following reasons, the Court grants the motion to dismiss for improper venue. Specifically, the Court finds that Allied's purchase orders at issue were the offers. MFS's sales quotes, which did not include the quantities Allied would order, lacked the definiteness required by the United Nations Convention on Contracts for the International Sale of Goods ("CISG"), which governs the substantive question of contract formation in this case. Consequently, MFS's order confirmations, which include, *inter alia*, MFS's General Terms and Conditions of Supply ("GTCs") and the forum selection clause therein, were counteroffers that plaintiff accepted when it failed to object within fifteen days of receipt of each confirmation. Therefore, the contracts include the forum selection clause, and the Court shall enforce it.[1]

I. BACKGROUND

A. Introduction

Plaintiff, an engineer and manufacturer of turbine parts, began its business relationship with MFS, a manufacturing company headquartered in Italy that specializes in prevision investment castings for gas turbines, in 2007. (Compl. ¶¶ 17, 19, 20.) Plaintiff sought to purchase parts from MFS for gas turbine assembly. (*Id.* ¶ 20.) To do so, Allied issued purchase orders to MFS that included the description of the goods to be provided, the amount, the delivery date, and the price. (*Id.*) Plaintiff claims that MFS generally would acknowledge plaintiff's purchase orders via a telephone call or email, and on certain occasions, MFS also would send plaintiff a formal written order confirmation. (*Id.* ¶ 21.) MFS contends that it formally accepted purchase orders only through written order confirmations—never via a telephone call or email.

Allied placed twenty-two orders with MFS from August 2008 through February 2012, with a total value exceeding five million dollars. The five orders at issue are:

(1) <u>Blade 1 Type 251</u>
   a. Allied Purchase Order: Sept. 23, 2008 (Def. Ex. A-2)
   b. MFS Order Confirmation: Oct. 30, 2008 (Def. Ex. A-3)
(2) <u>V94.2 Blade 1</u>
   a. Allied Purchase Order: Apr. 28, 2009 (Def. Ex. B-2)
   b. MFS Order Confirmation: Apr. 29, 2009 (Def. Ex. B-3)
(3) <u>V94.2 Blade 1</u>
   a. Allied Purchase Order: Aug. 12, 2009 (Def. Ex. C-2)
   b. MFS Order Confirmation: Sept. 10, 2009 (Def. Ex. C-3)
(4) <u>W25 Row 1 Blade</u>
   a. Allied Purchase Order: Aug. 12, 2009 (Def. Ex. D-2)
   b. MFS Order Confirmation: Sept. 10, 2009 (Def. Ex. D-3)
(5) <u>13 e2 Blade 4 and 13E2M05 Blade 5</u>
   a. Allied Purchase Order: Jan. 26, 2011 (Def. Ex. E-2)
   b. MFS Order Confirmation: Jan. 31, 2011 (Def. Ex. E-3)

At this juncture, the Court must determine the trajectory of contract formation and whether plaintiff consented to

---

[1] The Court therefore does not address *forum non conveniens* and the sufficiency of the pleadings.

2

agreements with MFS that contained a forum selection clause mandating the litigation of all related disputes in Milan, Italy. At the evidentiary hearing on December 10, 2013, defendants presented the testimony of two witnesses: Angela Mongelli ("Mongelli") and Mauro Bianchi ("Bianchi"). Mongelli is a former employee of MFS; she worked for MFS for thirty-three years and was its Sales Back-Office Representative in 2009, responsible for checking incoming purchase orders and preparing outgoing order confirmations. (Declaration of Angela Mongelli ("Mongelli Decl.") ¶ 1, Docket No. 30-1; Tr. 5:17–6:19.) Bianchi is MFS's General Manager of Sales; he began working for MFS in December 1999 and became Sales Manager in November 2009. (Declaration of Mauro Bianchi ("Bianchi Decl.") ¶ 1, Docket No. 23; Tr. at 66:21–67:5, 98:7–9, 100:15–18.) Plaintiff presented the testimony of one witness: David Mott ("Mott"), Allied's General Manager. (*See* Declaration of David Mott ("Mott Decl.") ¶ 1, Docket No. 28.)

Because the Court held the evidentiary hearing, it may resolve disputed facts in a manner adverse to Allied, which has the burden of demonstrating venue by a preponderance of the evidence. *See Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005) ("'[I]f the court holds an evidentiary hearing . . . the plaintiff must demonstrate [venue] by a preponderance of the evidence.'" (quoting *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)); *Novak v. Tucows, Inc.*, No. 06-CV-1909 (JFB)(ARL), 2007 WL 922306, at *6 (E.D.N.Y. Mar. 26, 2007) ("A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing . . ., and no disputed fact should be resolved against [the resisting] party until it has had an opportunity to be heard." (quoting *New Moon Shipping Co. v. Man B&W Diesel A.G.*, 121 F.3d 24, 29 (2d Cir. 1997))); *Magi XXI, Inc. v. Stato della Citta del Vaticano*, 818 F. Supp. 2d 597, 604 (E.D.N.Y. 2011) ("[A]bsent an evidentiary hearing, the Court must view the facts in the light most favorable to the plaintiff."). The Court has fully considered the evidence and written submissions presented by the parties. The facts discussed herein are drawn from the hearing exhibits and the witnesses' testimony and declarations. In resolving the factual disputes, the Court has carefully weighed the evidence, and it has evaluated the credibility of the witnesses who testified at the hearing. In particular, the Court finds the testimony of Mongelli and Bianchi to be fully credible in all respects.[2]

B. MFS's General Practices and the Standard Terms & Conditions

Transactions between MFS and its customers during the relevant time period generally proceeded as follows.

1. Sales Quote

First, an MFS Sales Manager, such as Bianchi or Gabriele Tuzi, produced a quote for a customer. (Tr. 10:8–10; 70:16–25.) According to Bianchi, "usually the transaction starts when we receive a request for a quotation." (*Id.* at 72:8–9.)

Each quote plaintiff received before 2010[3] generally included the following: (1)

---

[2] When the Court cites the testimony of a witness in the summary of facts, it has found such testimony to be credible in light of the witness's demeanor and all the evidence presented. As discussed *infra*, to the extent Mott's testimony contradicts Mongelli's and/or Bianchi's testimony, the Court does not find Mott's testimony credible. Moreover, as discussed *infra*, the Court finds Allied's recordkeeping unreliable in light of modifications made to the documents produced at the hearing.

[3] A shift in format occurred in 2010. (*Compare* Offer Quote # 085 09 NS, Pl. Ex. 18-A (April 2009), *with* Quotation 033/10/NS, Pl. Ex. 20-A (March 2010).)

3

an "Offer #" at the top of the page; (2) issue and expiration dates; (3) "Terms & Conditions," including the currency, payment terms (*e.g.*, 20 percent at order entry and 80 percent at shipment), shipping conditions and the packaging form; (4) information about the "tooling," which is used to make the wax molds necessary to design a part for manufacturing (*see* Tr. at 105:13–106:10); (5) the requirements for production, such as drawings, specifications, and 3D models; (6) information about production tests; and (7) details on the product, such as its description (*e.g.*, a blade), heat treatments, year volume (the number of sets, the number per set, and the total), the tooling (including its price and lead time), the qualification (including its price and lead time), and the product (including its unit price and lead time). (*E.g.*, Offer Quote # 108 08 NS, Pl. Ex. 1-A; Offer Quote # 085 09 NS, Pl. Ex. 3-A.)

None of the pre-2010 quotes at issue (and none of the other pre-2010 quotes in evidence, for that matter)[4] included a specific quantity to be purchased. Some of the quotes included a handwritten price near the unit price. (*E.g.*, Offer Quote # 108 08 NS.) In addition, in Quote #108 08 NS, at issue in this litigation, MFS wrote: "the offer is considered budgetary, since it is made without testing and material specifications." (*Id.*; *see also* Offer # 105 08 NS, Pl. Ex. 6-A (March 2008) ("[T]he offer is considered budgetary, missing material spec."); Offer # 163 08 NS, Pl. Ex. 8-A (November 2008) ("[T]he offer is budgetary, since the ceramic core and weight are estimated.").)

Each post-2009 quote generally included (1) a quotation or offer number; (2) a part description; (3) the quantity per set; (4) information about the alloy and heat treatment; (5) information about the tooling and the price for tooling; (6) a price for the FAIR; (7) a quantity; and (8) the unit price. (*E.g.*, Quotation 02/11/NS, Pl. Ex. 5-A (January 2011); Quotation 033/10/NS; Quotation 120/10/NS, Pl. Ex. 24-A (September 2010).) Some post-2009 quotations also include a subtotal.[5] (*E.g.*, Quotation 120/10/NS; Quotation 014/11/NS, Pl. Ex. 25-A (January 2011).) In some quotes, MFS wrote: "We reserve the right to review our prices in case of differences between your final drawing and specifications and the ones used as a reference for this offer. We reserve the right to review our prices in case of changes of raw material prices higher than ±10% form current raw materials market prices." (Quotation 02/11/NS; *see also* Quotation 033/10/NS.) In quote 02/11/NS, MFS also noted that "What hasn't been clarified with this quotation will have to be clarified at the moment of the PO [purchase order]."

2. Purchase Order

Second, the customer sent a purchase order. Based on the orders in evidence, the orders included the customer's name and contact information; an order number and date; a shipment method and payment terms; the name of a contact at MFS and the name

---

[4] Several quotes are not in evidence. The Court draws no specific adverse inference because of this alone, but it is remarkable that plaintiff has not produced the documents it claims were the offers for every transaction with MFS.

[5] Some of the post-2009 quotes listed a quantity that corresponds or is close to the quantity on Allied's corresponding purchase order. (*See, e.g.*, Jan. 13, 2011 Purchase Order, Pl. Ex. 24-B (quantity ordered corresponds to quantity in quote, and amount due corresponds to subtotal in quote).) The only post-2009 purchase at issue, however, is related to Quotation 02/11/NS. It lists a quantity of 120/130, which does not correspond to the quantity listed on the purchase order—133. (*See* Jan. 26, 2011 Purchase Order, Pl. Ex. 5-B, Def. Ex. E-2.)

4

of the purchasing agent; specific provisions about the parts and shipment methods; the quantity ordered; the part number and description; the date required; the unit cost; and the total amount due (in euros or dollars). (*E.g.*, Sept. 23, 2008 Purchase Order, Def. Exs. A-1, A-2; Apr. 28, 2009 Purchase Order, Def. Exs. B-1, B-2.)

### 3. Internal Review and Order Confirmation

Third, after receiving a purchase order, Mongelli (or an individual in a comparable position) checked it against the quote given to the customer. (Tr. 10:13–23.) Specifically, Mongelli checked "the parts that the customer order it [sic], the quantity, the price, the delivery, the specification, [and the] terms of payment." (*Id.* at 10:13–23.) She then drafted an order confirmation. Mongelli made no changes to the provisions of an order confirmation on her own. (*Id.* at 10:25–11:13.) Instead, MFS's technical production staff and sales personnel reviewed the proposed order confirmation. (*Id.* at 36:1–10.) In some cases, this review led to changes. (*Id.* at 37:2–10.) Following this internal input from MFS's technical and sales staff, and any resulting changes, Mongelli finalized the order confirmation. (*Id.* at 12:14–13:3.)

The MFS order confirmation forms at issue consist of four pages. "[T]he first one goes to the customer, and the other pages are carbon . . . copies, and one stays in the folder that the sales office keeps with the order and with the quotation. . . . One copy goes to the production and the other to the quality."[6] (*Id.* at 37:11–22.) MFS's General Terms and Conditions of Supply were printed in Italian on the reverse side of each page of the order confirmation. (*Id.* at 38:1–8.) Thus, when MFS mailed an order confirmation to a customer, the GTCs were on the back of every single page of the confirmation. (*Id.* at 43:17–22.) On the bottom left of the front page of the confirmation, MFS wrote (in Italian and English): "Please send back copy of the present document signed for acceptance of our sale's terms and conditions printed overleaf. After 15 days from receipt of the present we consider our conditions accepted." (*E.g.*, Oct. 30, 2008 Order Confirmation, Def. Ex. A-3.) As relevant here, the GTCs provide that the parties "agree that any legal claim or any other controversy will be subject to the exclusive jurisdiction of the Court of Milan." (General Terms & Conditions of Supply (Translation) ¶ 5, Bianchi Decl. Ex. 5.)

Fourth, the Sales Manager reviewed and, if it was acceptable, signed the order confirmation. (Tr. 44:7–12.) The confirmation then was returned to the back office, which "distribute[d] the internal paper and one copy goes to the receptionist that is in charge of doing the mailing to our customer." (*Id.* at 88:8–14.) During the time period in question, order confirmations always were sent by regular mail. (*Id.* at 25:7–12.) Mongelli typically would wait no more than ten days to send an order confirmation after receiving the purchase order.[7] (*Id.* at 12:3–10.)

Mongelli testified that an "order was not complete until [she] did an order confirmation." (*Id.* at 9:15–23.) She further explained that MFS's production department does not start working on an order until the

---

[6] The carbon pages were colored differently depending on whether they went to the customer, quality department, production department, or sales office. (Tr. at 102:22–103:1.)

[7] The evidence indicates that, in some instances, a longer period of time elapsed between the receipt of a purchase order and an order confirmation. (*Compare, e.g.*, Sept. 23, 2008 Purchase Order (sent September 23, 2008), *with* Oct. 30, 2008 Order Confirmation (dated one month after receipt of purchase order).)

5

expiration of the fifteen-day period to object to the GTCs because "[t]hey know because the procedure is that," and "I think it's the production manager that gives to the department the date when to start the production." (*Id.* at 54:20–55:8.) Bianchi agreed, testifying that "everything starts when we send the order [confirmation] to our customer . . . because it's when everything starts within our organization." (*Id.* at 98:25–99:5.) According to Bianchi, because MFS is a large company with complex production, "the only way to be on the same page is to have everything documented in your hand." (*Id.* at 99:5–8.) Further, "the order acknowledgement is the only official document." (*Id.* at 99:18–19.) He stressed that MFS is a foundry for complex parts made of super alloys mainly used for the aerospace business or industrial gas turbines. (*Id.* at 99:20–100:3.) Thus, engineers and other departments were involved from step one (*id.* at 100:4–9), but everything would start with "the final . . . signature of the sales director that confirms what is been agreed with the customer is on a piece of paper that can be distributed to the rest of the team in the plant" (*id.* at 100:23–101:1). Bianchi disagreed when asked whether MFS confirms orders over the telephone, sends confirmations months after receiving purchase orders, or sends confirmations via email. (*Id.* at 112:14–113:9.) He testified that MFS may resolve details of orders, such as technical aspects, via email and telephone, but it would not accept and confirm an order by telephone. (*Id.* at 68:2–10, 83:15–20.)

In sum, although plaintiff disputes MFS's description of the course of dealings between the parties, the Court finds Mongelli's and Bianchi's testimony regarding MFS's general practices credible in all respects. Plaintiff has introduced no credible evidence to undermine MFS's evidence of its general practices, or its evidence on how it handled the transactions at issue in this case.

## II. STANDARD OF REVIEW

Enforcement of a forum selection clause is an appropriate basis for a motion to dismiss pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. *See TradeComet.com LLC v. Google, Inc.*, 647 F.3d 472, 478 (2d Cir. 2011). Where an evidentiary hearing on the issue of venue has been held, as in this case, the plaintiff has the burden of demonstrating venue by a preponderance of the evidence. *See Gulf Ins. Co.*, 417 F.3d at 355.

"The enforcement of forum selection clauses in international disputes is governed by *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972)." *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 700 (2d Cir. 2009). In *M/S Bremen*, the Supreme Court held that mandatory forum selection clauses (in which the parties agree in advance that their contract will be governed exclusively by the laws of a particular forum) are entitled to a presumption of enforceability unless "enforcement would be unreasonable and unjust, or . . . the clause was invalid for such reasons as fraud or overreaching." 407 U.S. at 15. A forum selection clause can bind the parties even where the agreement in question is a form consumer contract that is not subject to negotiation. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589–95 (1991). Such clauses will be enforced only if found to be exclusive or mandatory. *See John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imps. & Distribs., Inc.*, 22 F.3d 51, 52–53 (2d Cir. 1994).

It is clear, based on the language of the forum selection clause at issue, that the choice of forum is mandatory, as specific language regarding venue is included in the clause, specifying that "any legal claim or

6

any other controversy will be subject to the exclusive jurisdiction of the Court of Milan" (General Terms & Conditions of Supply (Translation) ¶ 5). *See, e.g.*, *John Boutari & Son*, 22 F.3d at 53; *Cent. Nat'l-Gottesman, Inc. v. M.V. Gertrude Oldendorff*, 204 F. Supp. 2d 675, 678 (S.D.N.Y. 2002) ("For a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language."). The question, therefore, is whether plaintiff in fact consented to an agreement with defendants that contained this mandatory forum selection clause.

### III. DISCUSSION

Defendants argue that the case should be dismissed for improper venue because the forum selection clause contained within the contracts between plaintiff and MFS makes the courts of Milan, Italy the exclusive forum for any disputes. According to defendants, Allied's purchase orders were the offers, and MFS's order confirmations constituted counteroffers that plaintiff accepted when it failed to object timely to the inclusion of the GTCs in the contracts. In the alternative, defendants argue that Allied accepted the GTCs and the forum selection clause following contract formation, because it never objected to the GTCs during the parties' nearly four-year course of dealings. Plaintiff counters that the forum selection clause is not part of the agreements with MFS, because the contracts were formed when plaintiff sent the purchase orders accepting the terms in MFS's quotes.[8] Thus, according to plaintiff, the confirmations with the GTCs attempted to, but did not, modify the terms of the contracts. As set forth below, the Court concludes that the parties' contract was formed when Allied failed to object, within fifteen days of receipt, to the GTCs included in MFS's order confirmations. Therefore, the forum selection clause is a part of the parties' agreement, and plaintiff has demonstrated no basis to not enforce it.

### A. Trajectory of Contract Formation

The CISG governs the substantive question of contract formation in this case. *See, e.g.*, *Golden Valley Grape Juice & Wine, LLC v. Centrisys Corp.*, No. CV F 09-1424 LJO GSA, 2010 WL 347897, at *3 (E.D. Cal. Jan 22, 2010) [hereinafter *Centrisys*] ("The CISG governs only the formation of the contract of sale, and the rights and obligations of the seller and the buyer arising from such a contract."). Thus, the CISG governs whether and when the forum selection clause at issue became a part of the parties' agreement. In situations where a forum selection clause was imposed before a contract formed under the CISG (*i.e.*, as a part of an offer or counteroffer that later was accepted), courts have deemed the forum selection clause to be a part of the parties' consented to agreement. *See, e.g.*, *id.* at *5 ("The evidence establishes that at the time [the plaintiff] sent its sales quote to [the defendant], it contemporaneously sent its General Conditions[—which included a forum selection clause—]as part of the attachments. By adopting the terms of the sales quote, [the defendant] accepted the terms upon which the [goods] had been offered, including the General Conditions. Thus, [the defendant] accepted the General Conditions," including the forum selection clause at issue.). Courts have also deemed forum selection clauses interposed subsequent to contract formation to be a part of the agreement in cases where the other party assented to the clause's inclusion. *See, e.g.*, *BTC-USA Corp. v. Novacare*, Civ. No. 07-3998 ADM/JSM, 2008 WL 2465814, at *4 (D. Minn. June 16, 2008) (finding that plaintiff "expressed its assent to the forum

---

[8] The complaint notably is silent as to any quotes from MFS preceding plaintiff's purchase orders.

7

selection clause['s] . . . material alteration of the oral contract" between the parties by initialing the general conditions of sale provided by defendant). Where a party unilaterally has sought to add a forum selection clause after the parties already formed their agreement under the CISG, however, courts have held that the forum selection clause does not modify the contract agreed to by the parties. *See*, *e.g.*, *Chateau Des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 531 (9th Cir. 2003) (holding that, because "[a] contract is concluded at the moment when an acceptance of an offer becomes effective" under the CISG, complete and binding contracts were formed between the parties when they reached oral agreements on price and quantity, and subsequent invoices containing forum selection clauses sent by one party merely were an attempt to modify the contracts, which cannot be done unilaterally under the CISG (citation and internal quotation marks omitted)); *Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 458 (D. Del. 2008) (holding that parties formed contract under CISG in 2006 when they agreed on price, quantity, and freight terms, and concluding that forum selection clause contained in Conditions of Sale introduced unilaterally and subsequent to contract formation did not modify that contract under CISG); *see also CSS Antenna, Inc. v. Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 754 (D. Md. 2011) (concluding that, although defendant's order confirmations containing general conditions constituted counteroffers, forum selection clause contained therein could not be deemed part of contract for purposes of motion to dismiss for improper venue, because there was no evidence indicating that plaintiff had actual knowledge of the conditions or the fact that defendant intended those conditions to be incorporated into the contract).

As a threshold matter, here, the documentary evidence and the parties' course of dealing establish that no contract was formed under the CISG when plaintiff made its purchase orders. Under the CISG, "[a] contract of sale need not be concluded in or evidenced by writing and is not subject to any other requirement as to form." CISG art. 11. A proposal is an offer if it is "sufficiently definite and indicates the intention of the offeror to be bound in case of acceptance." CISG art. 14(1). Article 14(1) further states that "[a] proposal is sufficiently definite if it indicates the goods and expressly or implicitly fixes or makes provisions for determining the quantity and the price." Thus, a sales quote is sufficiently definite to constitute an offer under the CISG where it states the cost of building a product, fixes or makes provisions for determining the quantity of a product, states a timeline for production, and provides details about the product to be manufactured. *See Chateau des Charmes Wines*, 328 F.3d at 531 (finding that binding contract existed when parties sufficiently and orally agreed as to goods, quantity, and price); *Eason Automation Sys., Inc. v. Thyssenkrupp Fabco, Corp.*, No. 06-14553, 2008 WL 1901236, at *2 (E.D. Mich. Apr. 25, 2008) (concluding that quote stating cost of building machine, date of delivery, timeline for production, and details about product to be manufactured was "sufficiently definite to constitute an offer under the CISG," and that "the contract was formed upon verbal assent of Defendant which indicated that Plaintiff should begin work on the machine").

As detailed *supra*, none of the quotes at issue specified the quantities that Allied would order. Further, some quotes included language characterizing the quote as "budgetary" because of a lack of material specifications. (*E.g.*, Offer Quote # 108 08 NS.) Mott also acknowledged that he

8

sometimes would negotiate prices verbally with MFS before sending a purchase order. (Tr. 135:10–20.) Therefore, at most, the quotes "create[d] a framework for the future sale of goods but fail[ed] to establish specific terms for quantity and price," *Gruppo Essenziero Italiano, S.p.A. v. Aromi D'Italia, Inc.*, Civil No. CCB-08-65, 2011 WL 3207555, at *3 (D. Md. July 27, 2011) (citing *Amco Ukrservice v. Am. Meter Co.*, 312 F. Supp. 2d 681, 686–87 (E.D. Pa. 2004)), and they also lacked the information that would "fix[] or make[] provisions for determining the quantity" of the product that Allied would purchase, *Eason*, 2008 WL 1901236, at *2; *see also* CISG art. 14(1); *CSS Antenna*, 764 F. Supp. 2d at 752 (concluding that parties' inventory and supply agreement did not memorialize entire contractual arrangement, unlike parties' purchase order/confirmation arrangement, where agreement included no information regarding price or quantity); *Centrisys*, 2010 WL 347897, at *3 (finding an adequate offer where sales quote identified goods for sale, quantity of goods, and price). The record also contains no credible evidence of oral discussions that plaintiff and MFS may have had before plaintiff sent the purchase orders, during which they agreed to the goods, quantity, and price, and thus formed an oral contract.[9] Thus, under the CISG, an adequate offer only was made once plaintiff sent its purchase orders to MFS.

The evidence also establishes that MFS never accepted orders before issuing an order confirmation. Under the CISG, an offer is accepted if the offeree makes a "statement . . . or other conduct . . . indicating assent to an offer." CISG art. 18. "A contract is concluded at the moment when an acceptance of an offer becomes effective." CISG art. 23.

The order confirmations MFS issued after receiving plaintiff's purchase orders detailed the order; contained MFS's standard terms, including the forum selection clause; and demonstrate that MFS changed the payment terms and delivery dates for each order. MFS's witnesses credibly testified that these confirmations were mailed to plaintiff, although Mongelli and Bianchi did not exactly know when they were mailed.[10] (Tr. at 16:12–15, 114:3–13.) Although Allied disputes that it received confirmations with the standard terms for all twenty-two orders it placed with MFS, Mott acknowledged that Allied's records included the standard terms with at least twelve of the

---

[9] Plaintiff emphasizes that the August 12, 2009 Purchase Orders, which it claims it made during a telephone call with Tuzi, were "repeat" orders, "meaning that [Allied] was ordering the same materials, and accepting the same terms, as in MFS's prior offers/quotes." (Pl. Suppl. Br., at 2 (citing Tr. 127:13–128:6).) Specifically, Mott testified that Allied issued the purchase orders based on the original quote and a conversation with Tuzi "just basically negotiating verbally a different price considering they hadn't really gotten to full blown production yet." (Tr. 127:18–128:2.) Mott also said that when the parties agreed on a different price, MFS told him to "[s]end the purchase order tomorrow and we'll take it." (*Id.* at 135:21–22.) Defendants do not dispute that modification requests were made orally in conference calls and that the parties sometimes communicated via Skype to reach an agreement. (*See id.* at 167:18–25, 168:1–9.) Those facts, however, do not change the Court's finding. Instead, they underscore that, although some specifics of the orders were negotiated verbally, plaintiff arguably knew that MFS required a purchase order prior to the formation of a contract.

[10] In Bianchi's experience, regular mail from Italy to New York took eight to ten days to arrive. (Reply Declaration of Mauro Bianchi ("Bianchi Reply Decl.") ¶ 6, Docket No. 30-2; *see also* Tr. at 65:17–21.) In any event, this fact is irrelevant. The order confirmations provide that the date to accept or reject the GTCs ran from the date of receipt, not mailing. Further, MFS's decision not to monitor the receipt of the order confirmations does not show that MFS accepted the purchase orders through other means, or that a contract was formed when Allied sent its purchase orders to MFS.

order confirmations.[11] (Tr. 138:6–12.) As discussed *infra*, there also is no evidence in the record, other than Mott's testimony (which the Court does not find credible), that Tuzi or any other MFS representative confirmed orders via emails or during telephone calls. Therefore, plaintiff's contentions aside, the Court concludes that MFS consistently acted in accordance with its general practices with respect to its transactions with Allied and used the order confirmations to finalize the transactions. Whether the order confirmations properly incorporated the forum selection clause and thus were counteroffers rather than acceptances is a separate question.[12]

Plaintiff raises several issues it believes undermine MFS's claim that the confirmations mattered. The Court is unpersuaded.

First, plaintiff argues that Tuzi confirmed orders via email or during conference calls. (Pl. Suppl. Br., at 2 (citing Tr. 28:2–9; Pl. Exs. 10D, 13, 19D).) Plaintiff also argues that, on two instances, Mott asked for order confirmations because the orders had not been discussed orally, and, in response, MFS sent Mott a PDF copy of the order confirmation in an email, without reference to the GTCs. (*Id.* at 3–4.) As noted *supra*, there is no credible evidence that Tuzi confirmed orders via email or during calls, which would run counter to MFS's practice of requiring Allied to send the purchase orders. There is no documentary evidence that ever references an order confirmed by telephone or that clearly confirms an order via email.[13] Further, Mott's belief, based on certain conversations, that his orders were being processed (*see* Tr. at 168:1–9) does not establish the fact of confirmation.

Plaintiff's focus on the two instances when Mott asked for and received order confirmations via email (both related to the August 12, 2009 orders) also undermines its point. The correspondence (*see* Email Chain, Pl. Exs. 2D, 4D) is telling. On September 15, 2009, Mott wrote: "I have been begging for acknowledgment for you to *confirm acceptance and delivery* and I have yet to receive nothing. . . . I really would appreciate if someone confirmed our new p.o.'s as we were told the parts would all arrive this year and we are waiting for confirmation." (Email Chain, at 3 (emphasis added).) Tuzi responded that "the orders for the parts already tooled, have been confirmed. About the 2 new products, they will be probably confirmed by next week, since tooling are not here yet." (*Id.* at 2.) Mott replied, "Ok, *as always* for us confirmation is when you send us payment cadence." (*Id.* (emphasis added).) Tuzi responded, "You will receive the order confirmation." (*Id.*) On September 16, 2009, Mongelli emailed Mott, apologized for the delay in sending the confirmations due to

---

[11] Mott acknowledged that plaintiff repeatedly received order confirmations from MFS and that Mott would "glance" at them to review the material terms. (Tr. at 136:5–6, 156:10–157:1.) He also acknowledged having seen the confirmation form before September 16, 2009. (*Id.* at 161:14–20.)

[12] As discussed *infra*, the Court concludes that the confirmations were counteroffers that properly incorporated the forum selection clause.

[13] Given the complexity of the products, the Court finds it incredible that either company would consider binding itself without a written memorialization of the agreement. Furthermore, none of the emails plaintiff references confirm a specific order. The email in Exhibit 10D asks Mott to send Tuzi the order "asap"; the email in Exhibit 13 does not reference any specific order, and Mongelli testified that this email "was for general orders, not the specific order number" (Tr. at 28:22–23); and the February 10, 2010 email in Exhibit 19D, about an order not at issue, provides that MFS would confirm the purchase order, which MFS's exhibits indicate was done via an order confirmation also dated February 10 (*see* Def. Ex. F-11).

10

her absence, and attached copies of the confirmations for the tooled products. (*Id.* at 1.) Although those confirmations lacked the GTCs (but included the language at the bottom left about accepting the GTCs), Mongelli testified that she had the receptionist mail the originals of the confirmations with the standard terms on the reverse side to Allied one or two days later. (Tr. at 16:6–12.) The Court credits Mongelli's testimony and finds that these emails did not alter MFS's general practices. Mott's statements also indicate that he knew the order confirmations were important.

Second, plaintiff argues that the purchase orders were the acceptances because, immediately after sending the purchase orders, Mott would start discussing the details of the order with MFS's engineers. (Pl. Suppl. Br., at 3 (citing Tr. at 122:23–123:18), 4 (citing Tr. at 126:6–127:9).) Specifically, according to Mott, he discussed his drawings and models with the engineers "to help [Allied's] tooling vendors create the correct tooling." (Tr. at 126:9–12.) Mott believes that, "in cases where they were repeat orders that they had tools in house already from us, I can't imagine them taking that tool off the shelf, unless they were extremely busy, they would take it off the shelf within the week, maybe the next week and start injecting waxes." (*Id.* at 126:13–18; *see also id.* at 158:15–159:24 (testifying that he believed order had been accepted after purchase order sent because he had to speak with engineers, who guided Allied in producing necessary tools if tooling was not available).) Aside from the fact that Mott's emails belie his claim that the purchase orders finalized the contracts, this evidence at most indicates that MFS's engineers assisted Allied in preparing its tooling before an order was confirmed, in reliance on an imminent formation of a contract. The Court does not credit Mott's speculation that MFS would begin production immediately. Moreover, as indicated by Tuzi's September 15 email, MFS sometimes waited to confirm an order until the tooling was received, which explains any delays in Allied's receipt of a confirmation even after these discussions. (*Accord* Bianchi Reply Decl. ¶¶ 5–6 (stating that telephone discussions and emails were used to clarify customer orders, and that "[o]n most orders, we did not begin manufacturing for a month to a month and a half after we sent the order confirmations, in part because we need to order materials necessary for the particular manufacture").) The differing periods of time between Allied's orders and MFS's confirmations support this conclusion.

Third, plaintiff claims MFS backdated the order confirmations to make them appear as though they were prepared shortly after the purchase order was received. (Pl. Suppl. Br., at 5.) During the hearing, plaintiff focused on an MFS envelope postmarked February 27, 2012, arguing that the order confirmation supposedly enclosed therein was dated January 31, 2011. (*See* Pl. Ex. 27.) That confirmation, however, reflected a modification to the 2011 order: a changed delivery date as of February 23, 2012. (*See id.* at ADC-0010770; Tr. at 92:1–25.) Bianchi credibly testified that, when there are later changes to an order, "the original order confirmation date is always on top of the order confirmation, that never changes," but that "every change on the order confirmation is mentioned at the end of the order confirmation itself." (Tr. at 77:7–19; *see also* Tr. 114:18, 115:17–24.) Mongelli concurred, explaining that, following a modification, MFS would issue a new confirmation reflecting the modification and date thereof, with no change to the confirmation date itself. (*Id.* at 20:15–21:7, 22:12–13.) The Court also finds that testimony credible. Thus, the postmark on the envelope supports the conclusion that

11

MFS diligently mailed the modified order confirmation. It does not establish that MFS sent the original order confirmation months later or that MFS accepted orders through email or telephone. Indeed, Allied proffers no credible theory for why MFS would send any confirmations months after the tooling had been finalized.[14]

In sum, (1) Allied's purchase orders were the offers; (2) generally, MFS mailed order confirmations to Allied shortly after receiving a purchase order and the tooling (or after the parties agreed to a modification); (3) on the one occasion when MFS confirmed two orders via email because Mongelli had been absent, she attached the front pages of the order confirmations and promptly mailed complete copies; and (4) there is no credible evidence that MFS began manufacturing the products before the confirmations were issued and the time for objecting expired.

Finally, the Court finds that the order confirmations were not acceptances under the CISG, but instead were rejections and counteroffers, because MFS properly incorporated the GTCs and the material terms therein. The Court also finds that Allied accepted the counteroffers when it failed to object to their inclusion.[15]

Under the CISG, "standard conditions are only incorporated if one party attempts to incorporate the standard conditions and the other party had reasonable notice of this attempted incorporation." *Roser Techs., Inc. v. Carl Schreiber GmbH*, No. 11cv302 ERIE, 2013 WL 4852314, at *6 (W.D. Pa. Sept. 10, 2013). CISG Article 19 governs whether standard terms that are included in a reply to an offer are included in the contract. Article 19(1) provides that "[a] reply to an offer which purports to be an acceptance, but contains additions, limitations or other modifications is a rejection of the offer and constitutes a counter-offer." If the additional or different terms in the purported acceptance do not materially alter the terms of the offer, and if the offeror fails to object without undue delay, then the terms of the contract include the additional or different terms contained in the acceptance. CISG art. 19(2). Additional or material terms that alter an offer include terms relating "to the price, payment, quantity and quality of the goods, place and time of delivery, extent of one party's liability to the other or to the settlement of disputes are considered to alter the terms of the offer materially." CISG art. 19(3).

The evidence establishes plaintiff had notice of MFS's intent to include the GTCs, including the forum selection clause, in the contracts. Article 8 of the CISG governs the interpretation of the parties' statements and conduct. A party's statements and conduct are interpreted according to that party's actual intent "where the other party or could

---

[14] Relatedly, the Court finds that the evidence at the hearing establishes the unreliability of Allied's files. For instance, of the five purchase orders at issue in this case, Allied did not have matching copies of four of them. (*See* Tr. 141:25–143:8, 149:15–22, 150:18–152:6.) Instead, the correct copies of those purchase orders in the record are from MFS's files; the versions Allied produced later were modified and bear no resemblance to those sent to MFS. (*See* Def. Exs. A-1, B-1, C-1, D-1; *compare* Def. Ex. B-1, *with* Def. Ex. B-2.) Thus, the Court finds no credible evidence to support Allied's claims that it never received timely order confirmations or that order confirmations were sent months later and were backdated, and instead finds the testimony of Mongelli and Bianchi to be fully credible on that issue and all the other disputed factual issues.

[15] Even if the GTCs did not materially alter plaintiff's offer under Article 19 of the CISG, the GTCs would have become part of the contract because plaintiff did not object to the additional terms without undue delay. *See* CISG art. 19(2).

not have been unaware what that intent was." CISG art. 8(1). "The plain language of the Convention, therefore, requires an inquiry into a party's subjective intent as long as the other party to the contract was aware of that intent." *MCC-Marble Ceramic Ctr., Inc. v. Ceramica Nuova D'Agostino, S.P.A.*, 144 F.3d 1384, 1387 (11th Cir. 1998). If the other party was unaware of that party's actual intent, however, then the party's statements and conduct are interpreted "according to the understanding that a reasonable person of the same kind as the other party would have had in the same circumstances." CISG art. 8(2). "In determining the intent of a party or the understanding a reasonable person would have had," the court must give "due consideration" "to all relevant circumstances of the case including the negotiations, any practices which the parties have established between themselves, usages and any subsequent conduct of the parties." CISG art. 8(3). Thus, the parties' course of dealing may indicate that one or both parties did not intend to be bound pursuant to Article 14 until they agreed on other material terms and conditions, which requires an analysis pursuant to Article 8. *See Hanwha Corp. v. Cedar Petrochemicals, Inc.*, 760 F. Supp. 2d 426, 432 (S.D.N.Y. 2011) (reasoning that although one party accepted "sufficiently definite" offer, the undisputed facts indicated that offeror did not possess intent to be bound because parties' course of dealing in twenty prior transactions indicated that they did not begin to perform until they reached agreement, explicit or implicit, on all final terms of contract, including the choice of law and forum-disputes provisions).

Here, the Court concludes that a reasonable person in Allied's position would have been aware of the GTCs (and the forum selection clause) under the circumstances present here. The order confirmations included the GTCs in Italian on the reverse side, and the front side of the confirmations explicitly provided in English that the GTCs would be accepted if no objection was received within fifteen days. It is irrelevant that the GTCs were in Italian, especially given plaintiff's sophistication. *See MCC-Marble Ceramic Ctr.*, 144 F.3d at 1387 n.9 ("MCC makes much of the fact that the written order form is entirely in Italian and that Monzon, who signed the contract on MCC's behalf directly below this provision incorporating the terms on the reverse of the form, neither spoke nor read Italian. This fact is of no assistance to MCC's position. We find it nothing short of astounding that an individual, purportedly experienced in commercial matters, would sign a contract in a foreign language and expect not to be bound simply because he could not comprehend its terms. We find nothing in the CISG that might counsel this type of reckless behavior and nothing that signals any retreat from the proposition that parties who sign contracts will be bound by them regardless of whether they have read them or understood them."); *Marciano v. DCH Auto Grp.*, --- F. Supp. 2d ---, No. 11-CV-9635 (KMK), 2014 WL 1612976, at *6 (S.D.N.Y. Mar. 31, 2014) ("Under New York law, '[a] party is under an obligation to read a document before he or she signs it, and a party cannot generally avoid the effect of a [document] on the ground that he or she did not read it or know its contents.'" (quoting *Brandywine Pavers, LLC v. Bombard*, 970 N.Y.S.2d 653, 655 (N.Y. App. Div. 2013))); *In re Lehman Brothers Inc.*, 478 B.R. 570, 587 n.19 (S.D.N.Y. 2012) (noting that, under New York law, "[a] party's failure to read or understand a contract that it signs does not relieve it of its obligation to be bound by the contract"). Further, even though the parties never discussed the GTCs, plaintiff does not argue that the language on the confirmations was

13

ambiguous, that the confirmations merely directed it to a website to locate the GTCs, or that any of its principals were unaware of the confirmations and the fact that they contained conditions. *See Roser Techs.*, 2013 WL 4852314, at *9 (reasoning that standard conditions were not properly incorporated into contract under CISG because language on confirmations was ambiguous and merely directed party to another website, there was no evidence that company had actual knowledge of attempted inclusion of standard conditions or that parties had discussed them, and there was no evidence that company actually received standard conditions); *CSS Antenna*, 764 F. Supp. 2d at 754–55 (finding disputes as to whether plaintiff knew or should have known that defendant intended conditions to apply to contract, because language referring to general conditions was ambiguous and did not mention forum selection clause on its face, there was no evidence to show that plaintiff had knowledge of conditions, conditions were never discussed, and order confirmations went to billing department).

Therefore, the Court finds that MFS's order confirmations properly incorporated the GTCs, and that the additional terms therein were material under Article 19 because they related to, among other things, the settlement of disputes. Consequently, MFS's order confirmations were not acceptances of Allied's offers, but rather counteroffers. *See CSS Antenna*, 764 F. Supp. 2d at 752 (concluding that order confirmation was counteroffer under CISG because it included general conditions with forum selection clause). Plaintiff accepted those counteroffers with the GTCs when it did not object to them within fifteen days of receiving the confirmations.[16] *See, e.g.,* *Roser Techs.*, 2013 WL 4852314, at *9–10 (finding that order confirmations were counteroffers because they properly incorporated additional payment terms, unlike standard terms also referenced in confirmation); *Belcher-Robinson LLC v. Linamar Corp.*, 699 F. Supp. 2d 1329, 1336–38 (M.D. Ala. 2010) (concluding that forum selection clause, whether material or not, was not part of agreement regardless of trajectory of contract formation because plaintiff claimed to have actively objected to forum selection and to have communicated the objection to defendant); *cf. Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989) (in non-CISG case where plaintiff, after receiving orders from defendant, would return printed confirmation form with terms of transaction and arbitration provision on the reverse, because "[w]here, as here, a manufacturer has a well established custom of sending purchase order confirmations containing an arbitration clause, a buyer who has made numerous purchases over a period of time, receiving in each instance a standard confirmation form which it either signed and returned or retained without objection, is bound by the arbitration provision."). Accordingly, the agreements at issue are governed by a valid forum selection clause.

---

[16] Therefore, the Court does not address defendants' alternative argument that plaintiff accepted the forum selection clause after contract formation through the parties' course of dealings. Moreover, the cases defendants reference do not stand for the proposition that one party's proposed *modification* to an existing contract could become incorporated into a contract simply because the other party consistently fails to object to or reference the proposal, and the Ninth Circuit expressly has found to the contrary. *See Chateau des Charmes Wines*, 328 F.3d at 531 ("Nothing in the Convention suggests that the failure to object to a party's unilateral attempt to alter materially the terms of an otherwise valid agreement is an 'agreement' within the terms of Article 29. . . . We reject the contention that because Sabaté France sent multiple invoices it created an agreement as to the proper forum with Chateau des Charmes.").

14

## B. Enforceability of the Forum Selection Clause

Because defendants have demonstrated that the forum selection clause is valid, the burden shifts to plaintiff "to make a 'strong showing' in order to overcome the presumption of enforceability," *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006) (quoting *New Moon Shipping Co.*, 121 F.3d at 29), by demonstrating that "enforcement would be 'unreasonable or unjust, or that the clause [is] invalid for reasons such as fraud or overreaching,'" *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007) (quoting *M/S Bremen*, 407 U.S. at 15). Thus, a forum selection clause is unreasonable: (1) if its incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will be deprived of her day in court due to the grave inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clause contravenes a strong public policy of the forum state. *Thibodeau v. Pinnacle FX Invs.*, No. 08-CV-1662 (JFB)(ARL), 2008 WL 4849957, at *6 (E.D.N.Y. Nov. 6, 2008) (citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1363 (2d Cir. 1993)).

Plaintiff does not address the enforceability prong of the analysis. It does not argue that it was victim of either fraud or overreaching, and the evidence shows that the parties negotiated their agreement at arm's length. Further, plaintiff does not argue that enforcement of the forum selection clause would violate public policy or that Italian law is so fundamentally unfair that it may deprive plaintiff or a remedy. Finally, there is no evidence that litigation in Italy "will be so gravely difficult and inconvenient that [plaintiff] will for all practical purposes be deprived of [its] day in court." *M/S Bremen*, 407 U.S. at 18.

Accordingly, because the forum selection clause was incorporated into the parties' agreement and is enforceable, the Court grants defendants' motion to dismiss for improper venue. This case must be brought in Milan, Italy. Therefore, the Court denies defendants' motions to dismiss pursuant to *forum non conveniens* and Rule 12(b)(6) as moot.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss for improper venue, and denies the motions to dismiss pursuant to *forum non conveniens* and for failure to state a claim as moot. The Clerk of the Court shall close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 5, 2014
Central Islip, NY

\*\*\*

Plaintiff is represented by Edward Birnbaum of Herzfeld & Rubin, P.C., 40 Wall Street, New York, N.Y. 10005, and Lawton Squires, Lydia Ferrarese, and Mark Weissman of Herzfeld & Rubin, P.C., 125 Broad Street, New York, N.Y. 10017. Defendants are represented by Thomas J. Hall and Stacey Lynn Trimmer of Chadbourne & Parke LLP, 30 Rockefeller Plaza, New York, 10112.